[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 216 
In the early morning of April 8, 1980, two shotgun blasts took the life of Chickasaw Police Officer John Dotson, who was issuing a traffic citation to the defendant.
The defendant was indicted and convicted for the capital offense of murdering a police officer while the officer was on duty. Alabama Code, Section 13A-5-31 (a)(5) (Amended 1977). Sentence was fixed at life imprisonment without parole.
 I
The statute under which the defendant was indicted and convicted, as construed by our Supreme Court in Beck v. State,396 So.2d 645 (Ala. 1981), is constitutional. Willie Clisby,Jr. v. State (Ala.Cr.App., 6 Div. 576, Ms. March 2, 1982); JodyLynn Potts v. State (Ala.Cr.App., 4 Div. 948, Ms. March 2, 1982). We find no error in the defendant's prosecution under Section 13A-5-31 (a)(5) as modified by Beck, supra. The trial and sentencing procedures outlined in Beck were followed by the trial court and no error in this regard is apparent from the record.
 II
Contrary to the defendant's contention that he was only charged with the common law crime of second degree murder, the indictment clearly tracks the statutory language of the offense codified in Section 13A-5-31 (a)(5). The gravamen of this capital offense, as well as the thirteen other capital offenses found in Section 13A-5-31 (a), is an "intentional killing." "Without an `intentional killing' there could be no death penalty." Kyzer v. State, 399 So.2d 330, 335 (Ala. 1981).
 "Without question, the legislature has spelled out specifically what offenses it considers to be capital offenses. The Alabama legislature has substantially followed the Model Penal Code in describing with specificity those offenses which are deemed capital offenses. Code 1975, Section 13A-5-31. Each of the fourteen crimes specified requires an intentional killing with aggravation, and not some crime other than homicide under aggravated circumstances."
Beck, 396 So.2d, at 661-662.
The indictment in this case clearly charges that the defendant committed an intentional killing by alleging that the defendant "unlawfully, intentionally, and with malice aforethought, but without premeditation or deliberation, killed John Dotson." *Page 217 
The defendant's sentence of life imprisonment without parole does not constitute cruel and unusual punishment in violation of the Eighth Amendment. Certainly, for the capital offense that was committed in this case the defendant's punishment could have been fixed at death. See George Daniel v. State
(Ala.Cr.App., 4 Div. 987, Ms. April 20, 1982). Life imprisonment without parole is a constitutionally permissible sentence even for offenses which do not involve homicide.Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382
(1980); Britton v. Rogers, 631 F.2d 572, 578 (8th Cir. 1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327
(1981).
 III
The defendant argues that his warrantless arrest and the warrantless search of his home were unconstitutional. He also contends that his confession should not have been admitted into evidence because it was adduced in violation of his Sixth Amendment right to counsel.
At approximately 2:14 on the morning of April 8, 1980, Officer Marvin T. Booker of the Chickasaw Police Department testified that he received a radio dispatch to "backup" Officer Dotson at the intersection of Highway 43 and Saw Mill Road. Officer Booker heard Officer Dotson radio that he was stopping a traffic violator "for speeding and possibly DWI." Approximately three minutes later and before Officer Booker arrived at the intersection, Officer Dotson radioed that no backup was needed. Officer Booker resumed patrolling and a few minutes later received a third radio dispatch that Officer Dotson was "in trouble". Officer Booker arrived at the scene at approximately 2:27 A.M. and found Officer Dotson lying "in a pool of blood" at the rear of his patrol car. Officer Booker radioed for help and within two minutes other police officers began to arrive. Officer Dotson had sustained two shotgun blasts, one to the head and the other to the abdomen. An autopsy revealed that either of the two shotgun wounds would have been fatal.
Officer R.G. Jones of the Chickasaw Police Department arrived at the scene shortly after Officer Booker and found two spent shotgun shells near the victim's body. Officer Jones discovered a "ticket book" used by the Chickasaw Police Department lying on the victim. A ticket for a speeding violation made out to the defendant had been "all but completed" by the victim. The ticket contained the defendant's name, address, date of birth and tag number of his automobile. The defendant's driver's license was also located at the scene. The driver's license was current and had the defendant's photograph, address and "everything on it." Officer Jones also saw the victim's service revolver lying on the ground near the victim. The weapon was cocked but had not been fired.
Lieutenant G.E. Robinson of the Criminal Investigation Detective Division of the Prichard Police Department was dispatched to the murder scene around 2:30 A.M. With the defendant's driver's license in hand and tag number written on a slip of paper, Lieutenant Robinson dispatched four of his units along with Sergeant Bradford of the Saraland Police Department and Chief Barlowe of the Satsuma Police Department to the intersection of Highway 45 and McLeod Road where they were joined by two deputy sheriffs. From there the law enforcement officers proceeded to the defendant's home on Ulysses Drive where they arrived at approximately 3:00 A.M. Lieutenant Robinson parked his patrol car approximately twenty feet from the defendant's home, leaving the headlights on the front of the house. Robinson positioned two men at the rear of the defendant's home, one man on each side and "three or four of us in the front."
At this point in the proceedings the trial court conducted two hearings, out of the presence of the jury, to determine the legality of the warrantless search of the defendant's house and the admissibility of his confession. The substance of these hearings reveals the following. *Page 218 
Lieutenant Robinson verified that the tag number of the defendant's automobile, which had been backed in the carport, matched the tag number Officer Dotson had written on the defendant's traffic citation. One of the officers stationed to the rear of the defendant's house radioed Lieutenant Robinson that "he saw movement in the rear of the house." Approximately thirty seconds later, Lieutenant Robinson also observed a curtain in the front of the house open and close.
Lieutenant Robinson used a bull horn and called for the defendant to "come out". After three to five minutes the defendant came out the front door, waving and calling for the officers to "come on in." Robinson told the defendant, "No, I would rather you come on out." According to Lieutenant Robinson, as the defendant began walking towards the officers:
 "I let him get approximately ten to fifteen feet from the front of the house, and I walked up to him and I advised him `Mr. Owens, you are under arrest for investigation of murder. You have the right to remain silent and not make any statements at all. You have the right to an attorney. If you can't afford one, one will be afforded for you.' At that point, he says `I know my damn rights. Put me in the car.' And I obliged him."
The defendant was placed in the custody of two officers. Lieutenant Robinson, Sergeant Bradford and Chief Barlowe next proceeded to go inside the house because they had "no idea or no knowledge of how many people were involved in the shooting." As the officers approached the front door a white male named Mahan appeared in the doorway. Mahan rented a room from the defendant. When Mahan was asked if the officers could go in and look around, he gestured that it made no difference to him. Lieutenant Robinson testified that "We were looking for anybody else that may have been in the house" in order to secure "the premises for the safety of my people."
Inside a closet in a rear bedroom a .12 gauge pump shotgun was discovered. The closet did not have a door but "had a curtain on a string across the front." The curtain was "pulled back" so that Robinson was "able to look into that closet and see what was there." Lieutenant Robinson determined that the weapon had been recently fired. Robinson also saw a box of green, .12 gauge shotgun shells in plain view on a bedroom dresser. These shells were the same type as those found at the scene. Ballistics tests later demonstrated that the shells found at the scene had been fired from the shotgun found in the closet.
Sergeant Jack Creekmore of the Saraland Police Department first saw the defendant at the Saraland Police Station around 4:30 A.M. on the morning of the shooting. Through Sergeant Creekmore's testimony the proper voluntariness predicate for the defendant's confession was established. Prior to questioning the defendant, Sergeant Creekmore advised him of his constitutional rights under Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Sergeant Creekmore stated that when he was giving the defendant his Miranda
warnings and had gotten to the point "If you cannot afford a lawyer, one will be appointed for you before any questioning", the defendant told him, "I think I'll let ya'll appoint me one." Sergeant Creekmore then continued reading the remainder of the Miranda warnings to the defendant and ascertained that the defendant understood his constitutional rights. The defendant refused to sign the waiver of rights form.
 "I asked him if he understood his rights. He replied, `Yes, I do, but I'm not signing anything.' I told him `that's all right, just as long as you understand your rights.' He then stated, `I know my rights. I know that you are just doing your job. I know because I was a police officer for four years.'"
Sergeant Creekmore then began questioning the defendant concerning the events which had transpired earlier that morning. Sergeant Creekmore related the defendant's incriminating statement as follows:
"Q. What was that statement? *Page 219 
 "A. He told me about being stopped by the Chickasaw Police Officer, and what took place after the officer stopped him.
"Q. What did he tell you took place?
 "A. Said the officer told him he was speeding, and that he thought he was going to give him a warning and they talked a little. The officer went back and sat down in his car a minute or so and then got out and came back and told him he was doing sixty-five and he was going to give him a ticket. The defendant said he couldn't reason with him and that's when they had words. He said `I told him this is the end of life for myself. You are going to give me a ticket you son-of-a-bitch. Well, you are going to kill me or I'm going to kill you.' I went crazy. That was it.
 "Q. Did he admit to you, or did he tell you whether or not he did or did not shoot John Dotson?
 "A. Yes, sir. From that point I asked the defendant where was his gun. He told me in the trunk. I asked him what did Officer Dotson do while he was getting the shotgun out of the trunk. He replied, `It seemed like I saw him go for his gun. I kept waiting for to get hit. I shot twice and pumped the gun and clicked it. It wouldn't shoot no more. There was just two shells in the gun, that's all. I don't know what kind of shells were in the gun. I just shot twice. If I had a thousand in there I would have shot a thousand. Maybe this will teach them a lesson. They ought to know better than to have just one man in a car on patrol. Now, maybe they will hire some more. I was in law enforcement for four years, you know.'"
The defendant did not request a lawyer at any time during the interrogation. Sergeant Creekmore testified that later that morning, around 7:30 or 8:00 A.M., the defendant informed the district attorney, "I want my lawyer now", and that the district attorney "stopped talking with him."
The trial court determined that the search of the defendant's house and subsequent seizure of the murder weapon and shotgun shells were lawful and that the defendant's confession to Sergeant Creekmore was admissible. On the issue of whether or not the defendant had invoked his right to counsel, the trial judge stated:
 "I'm going to take the position that here is a man that said he was a police officer, knew his rights, didn't need to be advised of them. That, as I understood it, that when he got a lawyer he expected the State to furnish it, but that if he didn't want to answer questions he would say `I don't want to answer questions until I have a lawyer here and until you get me a lawyer.' I don't take the position and don't think that he took the position that he had to have a lawyer before he would talk further. And for that reason, I'm going to overrule your objection and admit the statement."
The facts pertaining to the defendant's arrest, the search of his house and subsequent seizure of the shotgun and shotgun shells, and the confession the defendant made to Sergeant Creekmore were then presented to the jury.
 A THE WARRANTLESS ARREST
The defendant contends for the first time on appeal that his warrantless arrest was unconstitutional. He maintains that the arresting officers acted on a "mere suspicion" as justification for his arrest. There is no merit to this argument. Initially, it must be noted that objections to evidence cannot be raised for the first time on appeal. Nichols v. State, 267 Ala. 217,100 So.2d 750 (1958); Thornton v. State, 390 So.2d 1093
(Ala.Cr.App.), cert. denied, 390 So.2d 1098 (Ala. 1980). We have carefully searched the entire record and fail to see where the defendant questioned[1] the legality of his arrest. Even constitutional rights can be waived on appeal if they are not *Page 220 
seasonably raised in the trial court. Fuller v. State, 269 Ala. 312, 113 So.2d 153 (1959); Harris v. State, 347 So.2d 1363
(Ala.Cr.App.), cert. denied, 347 So.2d 1368 (Ala. 1977).
The defendant did call the trial court's attention to Paytonv. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639
(1980), but only in reference to the search and seizure aspects of that case. There was no claim that Payton had any application to the defendant's warrantless arrest. Indeed, there would have been no validity to such claim, had it been made, because Payton was decided by the Supreme Court on April 15, 1980, seven days after the defendant's arrest. Payton does not have retroactive applicability. Clements v. State,390 So.2d 1131, 1135 (Ala.Cr.App.), cert. denied, 390 So.2d 1136
(Ala. 1980).
However, even if Payton were applied retroactively, the principles announced in that case would not in any way invalidate the defendant's arrest. There were "exigent circumstances" in this case which would have justified a warrantless entry into his house for the purpose of arrest.100 S.Ct. at 1378. The defendant's felony arrest in this case was anything but "routine". Some forty minutes before the arrest a police officer had been murdered and all the evidence pointed to the defendant. Clearly, the arresting officers were in "hot pursuit" of the defendant at the time of his early morning arrest. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642,18 L.Ed.2d 782 (1967); Taylor v. State, 399 So.2d 881, 891 (Ala. 1981). Even Payton recognized the "hot pursuit" exception.100 S.Ct. at 1386.
Here, the arresting officers were acting on much more than a "mere suspicion". Without question, the arresting officers had probable cause (or "reasonable cause", as that term is used in Alabama Code, Section 15-10-3 (3) (1975)) to arrest the defendant without a warrant. The evidence found at the murder scene implicating the defendant in the crime was overwhelming. As this Court stated in Tice v. State, 386 So.2d 1180, 1183
(Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980):
 "An officer may arrest without a warrant when `a felony has been committed and he has reasonable cause to believe that the person arrested committed it.' Section 15-10-3, Code of Alabama 1975. The rule of reasonable or probable cause is a `practical, nontechnical conception.' Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879
(1949). As defined in Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327
(1959):
 "`Probable cause exists where "the facts and circumstances within their (the arresting officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. . . .' (Citations omitted)
 "In determining whether there is probable cause to arrest, it is not necessary that the officer have before him evidence that would support a conviction for the offense. He need only have facts and circumstances within his knowledge which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed or was committing an offense."
Another appropriate factor to take into consideration in determining the existence of probable cause is the "gravity of the offense." People v. Sirhan, 7 Cal.3d 710, 102 Cal.Rptr. 385,497 P.2d 1121 (1972).
In applying the above principles of law to the facts and circumstances in this case, we hold that the defendant's warrantless arrest was lawful in all respects.
 B THE WARRANTLESS SEARCH
The warrantless search of the defendant's house after he had been taken into custody and the seizure of the shotgun and shotgun shells were constitutionally permissible due to "the exigencies of the situation." Warden v. Hayden, supra. Even inPayton, the Supreme Court indicated that the result in *Page 221 
that case might have been different if exigent circumstances had been present. 100 S.Ct. at 1378.
In Warden v. Hayden, the police entered Hayden's house a short time after Hayden had committed an armed robbery and placed him under arrest. After his warrantless arrest it was reported by officers in the house "that no other man was in the house." In the meanwhile, however, a police officer discovered a shotgun and pistol in the flush tank of a bathroom. A clip of ammunition for the pistol was found under Hayden's mattress and shells for the shotgun were found in a bureau drawer in Hayden's room. The Supreme Court held that these items, as well as items of Hayden's clothing, were properly introduced at Hayden's trial.
 "(N)either the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, `the exigencies of the situation made that course imperative.' McDonald v. United States, 335 U.S. 451, 456 [69 S.Ct. 191, 193, 93 L.Ed. 153]. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."
87 S.Ct. at 1645-46 (emphasis added).
We find the above rationale applicable in this case. Lieutenant Robinson's testimony made it abundantly clear that at the time the shotgun and shotgun shells were discovered he was attempting to secure the premises for the safety of his men, that "we were looking for anybody else that may have been in the house." At the time the defendant's house was searched, the law enforcement officers did not know how many persons were involved in the murder or if Mahan was the only other occupant of the house. It has been recognized that "the police may need to check the entire premises for safety reasons." Payton, supra, 100 S.Ct. at 1381. And, where the initial intrusion that brings the police within plain view of an incriminating article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is legitimate. Coolidge v. New Hampshire, 403 U.S. 443, 465,91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).
On the basis of information acquired prior to entry and prior to the defendant's arrest, the police had probable cause to believe that there were at least two people inside the house because of movements inside the residence which they had observed. Because the defendant had been arrested, it was not unreasonable for them to walk through the house to see if others were there. Indeed, under the circumstances of this case, "(i)t was not only prudent to check the house for additional confederates, it would have been careless not to do so. While in the house, the officers had no duty to shut their eyes." United States v. Spanier, 597 F.2d 139, 140 (9th Cir. 1977). Generally, see W. LaFave, 2 Search and Seizure Section 6.4 (b) (1978).
In addition to being justified as a search for potential accomplices, the entry into the house was justified under the "protective sweep" doctrine.
 "In some situations, the `potentiality for danger surrounding the arrest' may be so high that entry of premises to make a `protective sweep' will be permissible even though the arrest itself was achieved without entry. Typically, the reason no entry was made to arrest is because the police perceived the situation as a very dangerous one and thus took steps to cause the prospective arrestee to *Page 222 
exit the premises and submit to arrest outside. Even with that person now in custody, the police may have good reason to doubt whether they can withdraw from the area with their prisoner without being fired upon, in which case an entry and `protective sweep' is justified. Such entries have been upheld when a weapon used in a recent crime by the arrestee or a weapon used by someone in firing at the police from those premises is as yet unaccounted for, and also when police have information the defendant was traveling with armed associates or that the defendant was armed and accompanied by another."
2 LaFave 431 (emphasis added).
 C THE CONFESSION
We have carefully examined the surrounding facts and circumstances attending the confession the defendant made to Sergeant Creekmore in light of Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and find no error.
The critical issue is whether the remark the defendant made while being advised of his constitutional rights, "I think I'll let ya'll appoint me one", meant that he wanted a lawyer before answering any questions. We think not. The entire context of this remark is set out above.
The standards for determining whether an accused has waived his right to counsel during interrogation are stated as follows in Edwards, supra:
 "(W)aivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'"
101 S.Ct. at 1883-1884.
Here, the defendant stated unequivocally on several occasions following his arrest that he knew his rights and understood them. He repeatedly emphasized the fact that he had been a police officer for four years. Further, he specifically invoked his right to counsel when questioned by the district attorney later in the morning when he said, "I want my lawyer now." This fact demonstrates that he was well aware that he didn't have to answer questions without a lawyer.
In Edwards, it is clear that the accused wanted an attorney "before making a deal" or before answering any further questions. Here, the defendant did not make any definite request for a lawyer before he was questioned. The defendant simply stated, "I think I'll let ya'll appoint me one." In our opinion this statement, at most, indicates that the defendant wanted appointed counsel, as opposed to retained counsel, to represent him. It does not indicate that the defendant was unwilling, or that he even hesitated, to answer Sergeant Creekmore's questions. At no time before or during Sergeant Creekmore's questioning did the defendant specifically request a lawyer to be present even though he was apprised of that right. Under the circumstances of this case, Officer Creekmore was not required to initiate some form of inquiry designed to clarify the defendant's intentions. Williams v. State,387 So.2d 295, 297 (Ala.Cr.App. 1980).
We find that based upon the particular facts and circumstances surrounding this case, including the background, experience and conduct of the defendant, the defendant made a voluntary, knowing and intelligent waiver of counsel before giving his confession.
 IV
Upon review of the defendant's refused charges 7, 9, 10 and 11, we find that these instructions were either covered in other requested charges that were given or were substantially covered in the trial court's oral charge. Thus, their refusal was without error. Lambeth v. State, 380 So.2d 923 (Ala. 1979);Walker v. State, 265 Ala. 233, 90 So.2d 221 (1956). *Page 223 
 V
Finally, it is contended that the trial court committed reversible error in its oral charge by incorrectly placing the burden of proof on the defendant to establish self-defense. That portion of the oral charge to which the defendant duly excepted reads as follows:
 "Now, if you believe beyond a reasonable doubt and to a moral certainty that the defendant acted in what he thought was self-defense and that he actually committed this act because he felt that his life was in danger and that he could not get away from there without increasing that danger, then the defendant would be entitled to a verdict of not guilty at your hands."
There can be no question, and it is conceded by the State, that this portion of the oral charge states an incorrect proposition of law. See Lester v. State, 270 Ala. 631,121 So.2d 110 (1960); Howard v. State, 390 So.2d 1070
(Ala.Cr.App.), cert. denied, 390 So.2d 1077 (Ala. 1980). However, this error was harmless under Rule 45, ARAP. It appears from a review of the oral charge that the trial judge decided to instruct on self-defense because he felt there was "the possibility that there might have been evidence of self-defense" and because defense counsel had argued self-defense in closing argument. The undisputed evidence shows that the defendant was not free from fault in bringing on the difficulty and that he was, in fact, the aggressor. He could not, therefore, set up the plea of self-defense. The error in the oral charge placing too great a burden on the defendant to establish self-defense was harmless. Ragsdale v. State,134 Ala. 24, 32 So. 674 (1901); C. Gamble, McElroy's AlabamaEvidence, Section 457.02 (5)(a) (3rd Ed. 1977).
At trial, the defense was insanity. The defendant, through the testimony of others, admitted that he shot Officer Dotson but maintained that he suffered from a mental disease or defect. In our opinion, the fact that the jury did not sentence the defendant to death is due solely to the strength of this evidence.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] Our review of this case is not governed by Rule 45A, Alabama Rules of Appellate Procedure, the "plain error" rule, because there was no imposition of the death penalty. Graham v. State,403 So.2d 275 (Ala.Cr.App. 1980), cert. denied, 403 So.2d 286
(Ala. 1981).