HARRIS, Presiding Judge.
Appellant was convicted of robbery and sentenced to imprisonment in the penitentiary for a term of ten years. He and his counsel signed a waiver of arraignment form and appellant pleaded not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal. He was furnished a free transcript and trial counsel was appointed to represent him on this appeal.
Prior to trial appellant filed a motion for change of venue alleging that he could not get a fair and impartial trial in Montgomery County because of widespread publicity in the news media, on radio and television. He also filed a motion to quash the jury venire, claiming the jurors were prejudiced by the newspaper accounts relative to the crime for which he stood indicted. He based his motion on an editorial in the Sunday edition of the Montgomery Advertiser of February 26, 1978, entitled, “The Price of Justice,” and a cartoon appearing on the same page, as well as radio and television coverage.
At the hearing on the motion for change of venue copies of the editorial and cartoon were introduced into evidence. On voir dire of the jury venire drawn for the trial of the case all jurors who answered they had. read the editorial, seen the cartoon, heard the radio broadcast and seen the television newscast were excused by the Court on motion of appellant. Eight jurors were excused and the trial court struck from the venire one juror who admitted that she knew one of the persons employed at the store allegedly robbed by appellant. The qualifications of the other jurors were not drawn into question. The motion for change of venue was then overruled and denied.
The burden is on the defendant seeking a change of venue to show, to the reasonable satisfaction of the Court, that he cannot receive a fair and impartial trial. Such motions are addressed to the sound discretion of the trial court and will not be disturbed on appeal except for gross abuse. Publicity by the press, radio and television does not necessarily constitute ground for change of venue. Payne v. State, 48 Ala.App. 401, 265 So.2d 185; Mathis v. State, 280 Ala. 16, 189 So.2d 564; Turk v. State, Ala.Cr.App., 348 So.2d 878; Hurst v. State, 54 Ala.App. 254, 307 So.2d 62.
*366 The only evidence presented on the motion for change of venue was the testimony of the Editor of the Montgomery Advertiser who testified relative to the editorial and the cartoon. He expressed no opinion as to whether appellant could receive a fair and impartial trial. One attorney testified that he had read the editorial and news accounts of the alleged robbery and that if he was on the jury his verdict would be influenced by these news accounts.
We are of the opinion that the defendant did not support the burden of proving his motion and that change of venue was denied without error. Divine v. State, 279 Ala. 291, 184 So.2d 628.
Shortly after 2:00 p. m., on Friday, January 13, 1978, the Scottie Store on South Court Street in Montgomery was robbed by a lone bandit. He approached the manager at the cash register with his right hand in his coat pocket pointed directly at the manager and said, “Be calm, don’t make a move or say a word or I will shoot you. Just open the register and give me the money.” She opened the cash register and removed tens, fives and one dollar bills and handed them to him. The bandit then told her to lift the drawer under the cash register and give him the other money. She lifted the drawer and the robber reached over with his left hand and got the money from the drawer and started putting it in his pockets. He dropped two twenty dollar bills on the floor but in his haste he did not pick them up. He fled the store with his right hand still in his pocket. She stated the man took about two hundred and forty dollars.
The manager called the Police Department and gave a description of the bandit. She stated that the man was about six feet tall and was very slim, weighing about one hundred and thirty pounds. She further stated he was wearing a tan tweed cap and had on a long velvet, goldish brown coat. She said that his shoes were tannish brown with a mixed color on top; that he was in the store about ten minutes looking around before the robbery occurred.
She further testified that she recognized his picture in the paper the next morning and also recognized his photograph on television. She made a positive in-court identification based on her observation of him during the ten minutes he walked around in the store prior to the robbery and on his picture in the paper.
The police radio dispatcher put out an all points bulletin for the apprehension of the bandit and Officer William F. Hadden responded to the radio dispatch. Officer Hadden testified that he proceeded to Dexter Avenue and Perry Street with his blue lights flashing. He was in uniform and was driving a marked car. He turned the wrong way on South Perry Street and saw a man crossing Perry Street who fit the description given in the radio broadcast. He stopped his patrol car and asked the man to show him his identification. The man ignored the officer and kept walking south on Perry Street. The officer called the man a second time and the man started running. The officer followed the man and used the loud speaker in his car instructing the man to halt. The man ran east on Washington Street and the officer fired a warning shot in the air but the man kept running and turned into an alley off Washington Street. Officer Hadden then fired directly at the man’s legs and the shot struck the man and he fell in the alley. He stated the man kept his hand in his right coat pocket during the entire chase.
At trial Officer Hadden identified appellant as the man he chased and finally shot. He also identified State’s Exhibit No. 9, which was a photograph of the hat and coat worn by appellant at the time of the robbery and at the time he was apprehended. He further identified State’s Exhibits 4, 5 and 6 that depicted the man running and finally lying in the alley after being shot.
Ken Westphal testified that he was a photographer with the Advertiser-Jour nal and while at work he heard on the police scanner that there was a “code three” (robbery) at the Scottie Store and that a suspect was running South on Perry Street toward Washington Street. He left his of *367 fice with his camera, went to the front of the courthouse on Washington Street and saw a man running on Washington with a policeman in the patrol car pursuing him. He heard the policeman order the man to stop or halt and heard shots being fired. He identified State’s Exhibits 4, 5 and 6 as photographs made by him, and the photographs were admitted into evidence without objection.
Detective William R. Wilson testified that on January 24, 1978, he and his partner, Detective E. B. Alford, visited appellant at St. Margaret’s Hospital. Detective Wilson advised appellant of his Miranda, rights and warnings. At this time a voir dire hearing was held out of the presence and hearing of the jury.
At the voir dire hearing Officer Wilson stated that appellant said that he understood his rights. He did not request an attorney.
It was shown that no threats, promises, rewards or other inducements were made against or held out to appellant to get him to make a statement. The evidence clearly shows that appellant was in full possession of his mental faculties and freely and voluntarily gave the officers a statement that was taken on a tape recorder. The tape was subsequently transcribed and the officers carried the original and several copies of the transcribed statement to appellant at St. Margaret’s Hospital. He read the statement and affirmed its correctness to the officers and signed his name to the original but failed to sign the copies. One of the unsigned statements was given to appellant.
Appellant took the stand on the voir dire hearing and stated that he did not sign the statement, nor did he read it. He denied that he robbed the Scottie Store. He stated that he only saw Detective Wilson one time and that was on January 13, 1978, at the emergency room right after he had been shot.
At the conclusion of the voir dire hearing the trial judge ruled the confessory statement was knowingly, freely and voluntarily made and was admissible in evidence.
Back before the jury the State laid the pre-Miranda predicate and the confessory statement was admitted into evidence as State’s Exhibit No. 10.
Before the jury Detective Wilson testified that he investigated the robbery at the Scottie Store on January 13, 1978, and saw appellant lying in the alley off Washington Street. He stated appellant had a wad of money in his pockets and the amount was $214.00. Wilson again related that appellant voluntarily signed the transcribed statement and that he had no problem understanding the signed statement.
Appellant testified before the jury that he pleaded guilty in the summer of 1977 to a misdemeanor charge of buying and receiving stolen property and was fined $180.00 and sentenced to six months in the County jail. He could not pay the fine and left the State. He went to Detroit to live with his aunt who was ill. He stated he got odd jobs and saved over $400.00. He returned to Alabama just before Christmas of 1977 and still had most of the money he made in Detroit.
Appellant denied that he robbed the Scottie Store on the afternoon of January 13, 1978, and denied he had ever been in the store. He further denied that he signed a statement admitting the robbery. He stated that the $214.00 he had on his person after he was shot was the money he won shooting pool at the Red Bell Lounge in Montgomery.
Appellant stated that he saw the police car with the lights on as he was crossing Dexter Avenue and that the officer pulled his gun out and ordered him to come to him but he kept walking, and then ran away. He said he ran because he thought he was going to be put in jail for failing to pay the previous fine imposed on him in 1977. He admitted he was wearing a brown coat and a gold cap. He again denied making a statement to the officers that he was involved in robbing the Scottie Store.
On cross-examination appellant again denied that Detective Wilson or any other detective visited him in the hospital and *368 denied giving the officers a signed statement.
On rebuttal the State called Detective Alford and he testified that Detective Wilson was his partner on the date of the robbery. He was present when appellant was handed the transcribed statement. Appellant was asked to read the statement, to see if it was correct. Appellant was asked if he could read and he said he could. He then signed the statement.
Appellant raises three issues on this appeal in which he contends the trial court committed reversible error: (1) The trial court erred in allowing hearsay evidence, (2) the Court should have granted his motion for change of venue, and (3) the court erred in refusing to charge the jury on the lesser included ’ offense of grand larceny.
We have treated and resolved the issue involving the motion for change of venue.
On the question of hearsay evidence we quote from the record:
“By Mr. Bentley:
“Q. What opportunity was he given to review it, specifically? (This was in reference to the confessory statement.)
“A. It was handed to him and he had the opportunity to read it, to ask us any questions about it.
“Q. Now, did either of you or your partner, Detective Wilson, ask him if he could read?
“A. Detective Wilson did.
“Q. Recall that conversation for us please.
“A. He was asked about his education background, and asked if he could read.
“Mr. Williams: Your Honor, we are going to object to hearsay.
“The Court: Overruled. Who was telling you this, Mr. Pinkston?
“A. This was during the time we were interviewing him. He was asked if he could read. We were asking Mr. Pink-ston.
“The Court: All right. Overruled. Go ahead.
“A. And at that time he was asked if he could read and he stated he could. He was presented this statement to read. After a couple of minutes he looked up and said that was the same that he had told us prior when we recorded the statement, and he signed it at that time.
“Q. And that was done in your presence?
“A. Yes, sir.
“Q. While he was holding the statement, did it appear as though he were in fact reading it?
“A. Yes, sir. His eyes were following the lines, typed lines.”
It is clear from the above quoted testimony that the officers were talking directly with appellant. There can be no valid claim that this was hearsay evidence. Before the transcribed statement was legally admissible, it was necessary that appellant approve the accuracy of the statement taken on the tape.
Appellant’s contention that the trial court erred in not charging the jury on the lesser included offense of grand larceny is wholly without merit. The testimony of the manager of the Scottie Store clearly shows that the offense of robbery was committed. Appellant stated to her, “Don’t make a move or say a word or I will shoot you.” At this time appellant had his hand in his coat pocket and was pointing directly at her. The manager stated that she was afraid during the robbery and she followed his commands in giving him the money. This constituted the crime of robbery. Brooks v. State, 36 Ala.App. 310, 55 So.2d 366.
We have carefully searched the record for errors injuriously affecting the substantial rights of the appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.