Appellant, Darryl Travis Watkins,[1] was indicted for the capital murder of Officer Edward K. Alley, in violation of § 13A-5-31 (a)(5), Code of Alabama (Supp. 1978) (repealed 1981). On February 3, 1983, a jury found appellant guilty as charged in the indictment. The State asked, at the request of Alley's family, that appellant be sentenced to a term of life imprisonment without parole. The court instructed the jury accordingly, and the jury returned a recommended sentence of life without parole. Subsequently, the trial court imposed a sentence of life imprisonment without the possibility of parole. The court determined that appellant was indigent and appointed trial counsel to represent Watkins on appeal.
On December 25, 1980, Christmas day, Ms. Carol Evans was employed by the Majik Mart convenience store on 5th Avenue South in Birmingham. At approximately 12:15 p.m. a black male with a "silver" pistol entered the store and ordered Evans and the customers against the wall while he took the money from the cash register. The man then told Evans to open the safe in two minutes or "he'd blow my head off." Evans opened the safe and the "change bag" was taken from it. Evans observed the man leave in a 1973 to 1976 Chevrolet Nova. The police were called and informed of the robbery; however, an alarm attached to the cash register had already *Page 94 
been activated during the robbery. Evans did not get a tag number, nor could she testify to the number of occupants in the Nova as it drove off.
Evans testified that appellant was not the man who committed the robbery. A photograph of Benny Ray Jones was shown to Evans, and she identified Jones as the man who committed the robbery.
Officer George C. Rhodes of the Birmingham Police Department received a dispatch at approximately 12:28 p.m. informing him of a "robbery in progress" at the Majik Mart on 5th Avenue South. Rhodes was directed to "cover" 5th Avenue South, and Officer Alley (the victim) was directed to "catch Crestwood Boulevard." Alley radioed that he was behind a car matching the description of the robbery suspect's car, and that he was approaching Oporto-Madrid Road from Crestwood Boulevard. Rhodes proceeded toward Crestwood Boulevard as Alley reported the tag number of the car, which he had in the meantime stopped. The next radio dispatch Rhodes heard was from a "civilian" saying that an officer was down. Rhodes arrived at the intersection of Oporto Road and Crestwood Boulevard shortly thereafter and found Alley "laying in the street on his back in a pool of blood." Alley was still alive, but could not talk. Later that day Alley died of shock resulting from loss of blood from a gunshot wound to the right side of his chest.
Rhodes stated that he never saw the vehicle stopped by Alley. Alley's weapon was received by Rhodes from a "civilian" at the scene. The weapon was inspected by Rhodes and he determined that it had been fired.
Several eyewitnesses were present at the intersection of Oporto and Crestwood when Alley stopped the blue Nova. These witnesses basically testified to the same set of facts. The State's primary witness was Robert Echols, who was at the scene when Alley halted the blue Nova. Echols saw Alley standing behind the Nova with his gun drawn. Echols made a U-turn, crossed the median, obtained a direct view of the scene, and stopped to watch. As Echols stopped his vehicle, he observed the driver of the Nova get out and put his hands on top of the car. The passenger had his hands on the dash until he moved to get out of the car. The passenger was getting out of the car from the driver's side of the vehicle when he shot Alley. The driver got back in the car and drove off. Echols followed the Nova to the entrance of the interstate highway until a police car moved between them. Echols observed the passenger of the Nova place his gun out the window and fire at the police car. The Nova and police car pulled away from Echols and he exited the interstate to return to the scene of the shooting. Echols identified Benny Ray Jones at a lineup conducted on December 27, 1980, as the passenger of the Nova, but was unable to identify the driver.
Richard McPherson testified that he was stopped at a traffic light at Oporto and Crestwood when he observed Alley pull behind a small blue and white car occupied by two black males. McPherson observed the occupants go "down in the floorboard" of the vehicle, "like they were grappling around." Alley got out of his patrol car, walked toward the car and pulled out his weapon. The occupants put their hands on the dash. The driver got out and put his hands on the roof of the car. Alley was about five feet from the driver. McPherson testified that the passenger "swung around and there was a shot." The driver "turned around and it looked as if he pushed the officer and jumped back in," and left at a high rate of speed. According to McPherson, the passenger never got out of the car. McPherson then ran to the police car and radioed that "the officer in Car 82 had been shot." On cross-examination, McPherson testified that he did not hear the shot or see a gun; however, he stated that he observed two flashes and movement by the passenger and Alley. He stated that the first flash came from inside the Nova before Alley fell.
Robert A. Enoch observed a blue car occupied by two black males in front of him *Page 95 
as he was traveling down Crestwood Boulevard. A patrol car passed Enoch, with its emergency lights operating, and pulled behind the blue car. The passenger of the blue car adjusted the rear view mirror and then looked at the driver. Enoch observed Alley get out of the patrol car with his gun drawn before he passed the front bumper of the patrol car. Alley tapped the back window of the Nova twice with his pistol. The traffic light changed and Enoch made a turn. Enoch looked back and saw one of the occupants of the Nova standing beside the vehicle and facing Alley. Enoch saw nothing further.
Carol Nunnally observed a patrol car stop a blue and white Nova occupied by two black males. Alley approached the Nova and looked in the back seat. Alley's weapon was drawn and, with it, he motioned for the driver to get out of the car. According to Nunnally, the driver never got fully out of the vehicle before the passenger reached out and she heard two shots. Nunnally stated that all she saw was smoke coming from both of them. Alley fell back and the driver "slumped over" in the seat of the Nova. Seconds later the Nova drove off. Nunnally could not identify the occupants of the Nova. On cross-examination Nunnally stated that the driver was back in the car when the shots were fired and that Alley had his gun "down" when he approached the Nova.
Officer John T. Ellis of the Homewood Police Department was off-duty as he approached the Oporto-Crestwood intersection. Ellis heard gunshots and saw Alley "fly into the air and fall to the ground." Ellis did not see where the shots came from or who fired them. When Ellis arrived at the patrol car, he radioed for help and then proceeded to secure the crime scene. He obtained Alley's weapon and the spent shell, which he turned over to a Birmingham police officer.
Sgt. John C. Lanman heard the dispatch instructing Alley and Rhodes to proceed as ordered. Lanman had not been instructed to proceed to any designated area, although he was on his way to the intersection of Oporto and Crestwood when Alley radioed that he was stopping the suspect vehicle. As Lanman was approaching the I-20 entrance, he observed a car matching the description of the suspect car traveling at a high rate of speed up the ramp. Lanman followed the car onto the interstate highway when the passenger reached out and fired twice at Lanman's patrol car. The bullets fell between the two cars. Lanman followed the Nova to the 1st Avenue South exit and was unable to keep up after the Nova exited the interstate. Lanman could not identify either occupant of the Nova.
Officer William T. Gaut of the Birmingham Police Department was called to the scene at approximately 12:35 p.m. Alley had been transported to the hospital. Gaut was placed in charge of the investigation.
Gaut ran a check on the tag number Alley had reported. As a result of this check, Gaut and others proceeded to a certain address, where they talked with Jones's sister. Gaut obtained the tag number and description of a second vehicle, a Dodge, which belonged to Jones's sister. This second vehicle was located at the Bama Motel on 1st Avenue North. When Gaut arrived at the Bama Motel, the area was being evacuated, except for Room 19 where the suspects were believed to be hiding. For a two-hour period, the authorities attempted to make contact with the occupants of Room 19. Eventually, the police were required to make a forced entry into the room whereupon they discovered appellant and Benny Ray Jones. Gaut next saw appellant at Cooper Green Hospital where appellant was being treated for a gunshot wound to the hip.
While appellant was being treated in the hospital, he made a statement, after proper warnings in compliance with Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were given, in which he took full responsibility for the robbery and shooting. According to this statement, Jones was an unwilling participant. This statement was recorded and later transcribed. *Page 96 
An evidence technician at the robbery site found the fingerprints of Jones on certain articles left in the store by the robber. Evidence technicians also found a bullet hole in the fender of the Nova. There was no weapon found in the Nova; however, a pistol was recovered from the inside lining of the mattress in Room 19 at the Bama Motel. The bill of sale for the Nova was located, and it indicated that Jones owned the automobile.
Appellant was taken to a lineup on December 27, 1980. Following the lineup, a second statement was made by appellant, after proper warnings in compliance with Miranda were given, in which he stated he robbed the Majik Mart, but later changed his story and said that Jones robbed the Majik Mart. Appellant admitted that he was driving the Nova and stated that Alley shot him (appellant) before he got out of the car. Appellant did not confess to shooting Alley, nor did he say that Jones did it. This statement was recorded and transcribed.
On cross-examination, Gaut testified that he would agree that his investigation indicated that appellant did not actually rob the Majik Mart, nor did appellant shoot Alley. Gaut stated that his information suggested that Jones shot Alley.
Outside the presence of the jury, Captain Earnest E. Solsby stated that he was the captain in charge of the Birmingham City Jail in December 1980. Four days after Alley was killed, Solsby sent a memorandum to all jail supervisors directing that they check with all personnel concerning "harsh statements in regard to having killed police officers and the possibility of killing more." The memorandum directed all personnel to determine if they had heard any such comments from four specific inmates, including appellant, and if so, they were directed to furnish Solsby this information in writing. This information was needed "in determining the amount of bond to be set for" the named inmates.
Officer Norman Willingham testified, before the jury, that in December 1980, he was a recruit for the Birmingham Police Department and was working in the jail. Willingham testified that while working in the jail, he overheard appellant make certain statements regarding the killing of police officers. Willingham testified that when he heard these statements, he was not aware of any memorandum, although at his next shift he was informed of its existence. The statements were reported to Willingham's supervisor, who instructed him to write them down. According to Willingham, appellant asked if he could have his blanket out in the day room and when he was told he could not, appellant stated, "There is no sense in ya'll treating me bad like that because I killed that mother fucking policeman. The mother fucker should have shot me first." Appellant also stated, "You damn right I shot the mother fucker and I'm going to kill me some more cops when I get out on the streets . . . man it don't bother me to kill."
On cross-examination, Willingham stated that he had not said anything to appellant to elicit such a response. No one had read appellant his Miranda rights immediately prior to the making of these statements. Willingham stated that Officer Frazier told appellant he could not have the blanket.
Officer Kenneth Frazier of the Birmingham Police Department stated that he was working in the city jail during December 1980. Frazier had not seen the Solsby memorandum and had not been directed to listen for statements made by inmates regarding the killing of police officers. On the morning of December 29, 1980, Frazier and Willingham were preparing the inmates for their morning "feeding," when appellant approached Frazier and asked if Frazier thought they would let him (appellant) go. Frazier responded that it would depend on what appellant had done. Appellant stated, "I am the one who shot that police officer." According to Frazier, appellant continued, saying, "Yes, I shot the mother fucker and I'm gonna shoot another one again. He should have shot me and when I get out of here, I'll shoot me some more police if they try to shoot me." Appellant asked if he could take his blanket *Page 97 
into the day room and Frazier said he could not, to which appellant responded, "You are just treating me like a goddamn dog because I killed that mother fucking police." As appellant walked away, he made more statements of similar fashion, which Frazier did not record. We note that Frazier's testimony was contradictory; that at times it was inconsistent with his written statement; and that he was uncooperative during cross-examination by the defense.
After the State rested, the defense recalled Officer Gaut, who testified that he was aware of the statements made by appellant at the city jail. According to Gaut, appellant's statement did not affect his opinion of what happened on December 25, 1980. The defense then rested.
 I
Appellant first contends that the trial court erred in admitting the unsigned, typed transcripts of statements made by him when he did not have an opportunity to approve the accuracy of the transcripts. Apparently, appellant contests the authenticity of the transcripts. Appellant's first statement was given on December 25, 1980, while he was being treated at Cooper Green Hospital for a gunshot wound to the hip. Appellant was properly informed of his Miranda rights and signed a written waiver of rights. The Miranda predicate was properly established. Appellant then made a statement which implicated him in the crime. Gaut tape-recorded this statement and a typewritten transcript was made from that recording. Appellant was not given an opportunity to review the transcript or otherwise approve the accuracy of it.
A second statement was made by appellant following the lineup conducted on December 27, 1980. This statement contradicted parts of his first statement. Appellant was again informed of his Miranda rights and voluntarily waived them. The Miranda
predicate was properly established. Gaut tape-recorded this second statement and a typewritten transcript was made from that recording. Appellant was not given an opportunity to review the transcript or otherwise approve of the accuracy of it.
Gaut testified that he was present during the entire conversations; that he had compared the tape recordings to the typed transcripts; and that they were identical. Gaut testified that the second statement listed two corrections he had made from comparing the tape recording to the typed transcript and, with those corrections, the two were identical.
Prior to trial, copies of the transcripts had been provided to defense counsel and counsel had been allowed access to the tape recordings at the hearing on the motion to suppress held during March 1981. (The trial was begun on January 21, 1983.) Appellant does not point out any inaccuracies in the transcripts, nor does he suggest the existence of any.
Appellant relies on Pinkston v. State, 365 So.2d 364, 368
(Ala.Cr.App. 1978), for the proposition that "[b]efore the transcribed statement was legally admissible, it was necessary that appellant approve the accuracy of the statement taken on the tape." This court cited no authority for this proposition. In Pinkston the defendant signed a transcript of the tape-recorded statement and later claimed he did not sign it. In the case at bar, appellant never signed the statement, nor did he review it for errors afterwards. We believe thatPinkston correctly states the proposition that a transcript of a taped statement is admissible (assuming all other predicates are properly laid) when there is evidence that the defendant "approved the accuracy of the statement." However, there exist other methods by which the accuracy of a statement transcribed from a tape recording may be established.
In Hawkins v. State, 443 So.2d 1312, 1314 (Ala.Cr.App. 1983), we stated:
 "Here, the State could have proved the contents of Hawkins' statement without the tape recording or the typewritten transcript. Any person who was present and heard the statement could have testified *Page 98 
to its contents. Gordon v. State, 34 Ala. App. 278, 280, 41 So.2d 608, affirmed, 252 Ala. 492, 41 So.2d 610 (1949). . . .
". . .
 "However, once the State attempted to show that the confession was in writing, `then the best evidence rule governed the question of identifying the writing setting forth the confession.' [Citations omitted.]"
Prior to Hawkins, the Alabama Supreme Court held in Bennefieldv. State, 281 Ala. 283, 285, 202 So.2d 55, 57 (1967), that "the stenographer who took down the questions and answers in shorthand . . . was the only person who could testify as to the authenticity of the transcription made from her shorthand notes." In Hawkins, 443 So.2d at 1314-15, we stated:
 "We do not think that Bennefield provided the only way in which a transcript of a confession may be authenticated. A typewritten transcript of a recorded conversation is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflected the conversation. People v. Ketchel, 59 Cal.2d 503, 30 Cal.Rptr. 538 [545], 381 P.2d 394, 401
(1963).
 "Where the use in evidence of typewritten transcripts of sound recordings has been objected to as a violation of the best evidence rule, the general rule is that the typewritten transcripts have been held admissible in evidence if their accuracy and reliability is clearly established. 29 Am.Jur.2d Evidence, Section 436 (1967); Annot. 58 A.L.R.3d 598 (1974)."
See also Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App. 1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, ___ U.S. ___,106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Hamilton v. State,455 So.2d 170 (Ala.Cr.App. 1984); Gwin v. State, 425 So.2d 500
(Ala.Cr.App. 1982), writ quashed, 425 So.2d 510 (Ala. 1983).
In the case sub judice, the admissibility of the transcripts of the tape-recorded statements were not dependent upon appellant's examination of the transcripts to approve their accuracy. Gaut, who was present during the questioning; who listened to the tape recordings; who compared the transcripts to the tape recordings, and who corrected any discrepancies, could properly authenticate the accuracy and reliability of the transcripts. We find no error in the trial court's admission of the transcripts into evidence.
 II
While appellant was being treated at Cooper Green Hospital for a gunshot wound to the hip, he was given an injection of Demerol. Appellant contends that the statement subsequently obtained by Officer Gaut was inadmissible due to the "debilitating psychological effect" of the drug.
Appellant was given an injection of Demerol at 7:30 p.m., and his statement was begun at 8:52 p.m. on December 25, 1980. Gaut spoke with the attending physician, who informed Gaut that appellant was being kept at the hospital for observation since a police officer was involved in the incident. Gaut testified that, according to the attending physician, "[u]nder normal circumstances he would put a Band-Aid on [appellant's] wound and send him home." The physician did not indicate to Gaut that appellant was under medication. Gaut asked the physician if appellant was "alert or was he under any sort of medication that would prevent him or distort what he might be saying if I talked to him." The doctor told him, "No." According to Gaut, appellant appeared "alert" and was not in any way drowsy or sleepy during the taping of his statement. The defense offered nothing to contradict the evidence presented by the State relating to appellant's coherent condition during the taping of his statement. Nor did appellant offer any evidence as to the "debilitating psychological effect" of the drug Demerol, other than a citation in his brief to the Physician's Desk Reference
(34th ed. 1980), which notes "several potential adverse reactions" that could result from the administration of *Page 99 
Demerol. Nothing in the record suggests that appellant experienced any of those potential adverse reactions."
In Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1985), we stated:
 "It is well settled that in order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. . . . `Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.'" (Citations omitted.)
This standard equally applies to statements made under the influence of sedatives. Myers v. State, 431 So.2d 1342, 1345
(Ala.Cr.App. 1982), cert. quashed, 431 So.2d 1346 (Ala. 1983), and cases cited therein.
The voluntariness of an alleged confession or incriminating statement is initially a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or manifestly wrong. Moore, supra; Tice v. State, 386 So.2d 1180
(Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala. 1980). The trial court is to make this determination based upon a consideration of the "totality of the circumstances." Blackburnv. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 280, 4 L.Ed.2d 242
(1960). See also Myers, 431 So.2d at 1345.
In the case at bar, there was absolutely no evidence that appellant was under the influence of the drug to such an extent that he had reached a state of mania or that the drug had so impaired his mind and will that he was unconscious of the meaning of his words. Appellant's bare allegation that the injection of Demerol had a "debilitating psychological effect" is wholly insufficient to support a claim that his statement was involuntary.
We find substantial credible evidence from which the trial court could have concluded that the statement made by appellant on December 25 was knowingly and voluntarily made. The decision of the trial court was not contrary to the great weight of the evidence and will not be disturbed on this appeal. We find no error in admitting the contested statement.
 III
Appellant argues that the statements he made at the Birmingham City Jail to Willingham and Frazier should have been excluded because they were made in the context of a custodial interrogation, thus requiring appellant to be informed of his rights pursuant to Miranda. As we previously noted, and as acknowledged by appellant in his brief, appellant initiated the conversation by asking Frazier, "Do you think they will let me go?" Frazier then responded that it would depend on what appellant had done, to which appellant responded that he "was the one who shot the police officer." Appellant argues that when Frazier responded to appellant's question, Frazier should have realized that he was entering a Miranda situation, and thus should have advised appellant of his rights. We disagree.
In our opinion, the statements made by appellant were volunteered and were not the product of a "custodial interrogation" or its functional equivalent.
 "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element of law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Page 100 
Miranda, 384 U.S. at 478, 86 S.Ct. at 1630. See also RhodeIsland v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297
(1980). In Innis, the Court dealt with the issue of "interrogation" when a defendant is in custody and has asked for, but not yet received, assistance of counsel. The Court stated in Innis, 446 U.S. at 301-03, 100 S.Ct. at 1691:
 "We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Footnotes omitted; emphasis in original.)
See also Stahl v. State, 426 So.2d 909, 913 (Ala.Cr.App. 1982), writ quashed, 426 So.2d 917 (Ala.), cert. denied,463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). We do not believe that Frazier's response to appellant's question was one "reasonably likely to elicit an incriminating response." Rather, we view this as a logical response to the question asked, especially in view of Frazier's testimony that he did not know who appellant was at the time the question was addressed to him.
Appellant's contention that there was an "ongoing custodial interrogation in a jailhouse environment" due to the "Solsby memo" is without merit. Frazier and Willingham testified that they had not seen, nor heard of, the memorandum at the time the statements were made by appellant, and we therefore need not address this question.
We find no error in the trial court's admission of these statements at trial.
 IV
At trial, the court allowed the State to present evidence of the Majik Mart robbery, instructing the jury that this evidence was admitted for a limited purpose and that appellant was not on trial for the offense of robbery. Appellant contends that this evidence was prejudicial, immaterial, and irrelevant. The State argues that the robbery was so intermixed and connected with the killing of Alley that they were both part of one continuous criminal transaction.
The general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which an accused is being tried.Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953). This court has recognized several well defined exceptions which allow evidence of other crimes to be presented during trial. InTwilley v. State, 472 So.2d 1130, 1135 (Ala.Cr.App. 1985), we reviewed these exceptions and noted: "The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible." In C. Gamble, McElroy's Alabama Evidence § 70.01 (12)(b) (3d ed. 1977), it is stated:
 "The prosecution may prove the accused's commission of another crime if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide. This rule is based upon the reasoning that the other crime was part of the res gestae or, with the now-charged crime, forms a part of one continuing transaction." (Footnote omitted.) *Page 101 
We find that the evidence of the robbery of the Majik Mart was admissible as part of the res gestae of a continuous criminal occurrence. The events leading up to the killing of Alley began with the robbery of the Majik Mart. "No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which defendant is charged." Colemanv. State, 487 So.2d 1380 (Ala.Cr.App. 1986), and cases cited therein. The trial court did not err in overruling appellant's objection to the admission of this evidence.
We find no merit to appellant's argument that this evidence was admitted to allow the State to use the felony murder doctrine in order to prove the element of "intent to kill." Foremost, the jury was instructed only on the offense of capital murder; it was not given the option of the lesser included offense of felony murder. Thus, there was no chance that the jury relied on the doctrine in its finding that appellant had the required intent to kill. Furthermore, a finding that appellant was guilty of the crime charged is justified without reliance to any extent upon the felony murder doctrine. (See part VI of this opinion.)
 V
Appellant's sentence of life without parole does not constitute cruel and unusual punishment in violation of the Eighth Amendment. Owen v. State, 418 So.2d 214, 217
(Ala.Cr.App. 1982). Appellant could have received a death sentence in view of his degree of participation in the killing. See Ritter v. State, 429 So.2d 928 (Ala. 1983); Lindsey v.State, 456 So.2d 383 (Ala.Cr.App. 1983), aff'd, 456 So.2d 393
(Ala. 1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384,84 L.Ed.2d 403 (1985); Womack v. State, 435 So.2d 754
(Ala.Cr.App.), aff'd, 435 So.2d 766 (Ala. 1983), cert. denied,464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). "Life imprisonment without parole is a constitutionally permissible sentence even for offenses which do not involve homicide."Owen, 418 So.2d at 217, and cases cited therein.
 VI
Appellant's final argument is that the verdict was contrary to the great weight of the evidence and specifically that the State failed to prove appellant had a "particularized intent to kill." We believe that appellant was properly convicted as an accomplice to the capital murder of Alley, and that the State properly proved each element of the crime with sufficient evidence from which the jury could reasonably return a verdict of guilty.
Appellant was indicted for the capital offense of:
 "The murder of any police officer, sheriff, deputy, state trooper or peace officer of any kind, or prison or jail guard while such prison or jail guard is on duty or because of some official or job-related act or performance of such officer or guard. . . ."
Alabama Code § 13A-5-31 (a)(5) (Supp. 1978) (repealed 1981). "Murder," as used in this code section, is defined by § 13A-6-2
(a)(1), Code of Alabama 1975, which reads as follows:
"(a) A person commits the crime of murder if:
 "(1) With intent to cause the death of another person, he causes the death of that person or another person. . . ."
In Murry v. State, 455 So.2d 53, 62 (Ala.Cr.App. 1983), rev'd, 455 So.2d 72 (Ala. 1984), this court was dealing with an indictment under § 13A-5-40 (a)(5) (the 1981 Capital Punishment Statute), which is essentially similar to the statute before us. The court noted that, in accordance with that statute and the murder statute, two elements must be proven to establish this capital offense: (1) intent to kill, and (2) the person killed was a law enforcement officer. In reversing, our Supreme Court recognized a third element: knowledge that the victim is an officer on duty, or at least "a mentally culpable state regarding the victim's status, such as reckless disregard of facts which should put the offender on *Page 102 
notice that the victim was a peace officer." 455 So.2d at 78. In the instant case, the State's evidence was sufficient for the jury to conclude beyond a reasonable doubt that Alley was on duty as a Birmingham police officer when he was killed and that appellant had knowledge that Alley was a police officer on duty.
The tendency of the evidence, and the State's theory of the case, is that Jones actually shot Alley and appellant was an accomplice to the killing. We believe there was sufficient evidence from which the jury could conclude that appellant was an accomplice to Jones's activities on December 25, 1980. According to the complicity statute, § 13A-2-23, Code of Alabama 1975:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense;
 "(2) He aids or abets such other person in committing the offense. . . ."
In Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App. 1984), we stated:
 "`Aid and abet "comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary"'. Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314
(1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108
(1877). `The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala. App. 632, 198 So.2d 625. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.' Miller v. State, 405 So.2d 41, 46
(Ala.Cr.App. 1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App. 1977), cert. denied, 357 So.2d 161
(Ala. 1978)." (Emphasis in original.)
Furthermore, in Sanders v. State, 423 So.2d 348, 351
(Ala.Cr.App. 1982), it was stated:
 "Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala. App. 151, 326 So.2d 680 (1975), cert. denied, 295 Ala. 419, 326 So.2d 686 (1976). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred. Smith, supra."
In considering accomplice liability for a capital offense, we must look beyond the general principles, to the following:
 "`[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala., March 6, 1981)'; Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala. Law. 456, 468 (1981). See also Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App. 1982), holding that Enmund is inapplicable to a defendant who does not receive the death penalty. However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 270 (Ala. 1979). `[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.' Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). *Page 103 
". . .
 "Our duty on appeal was stated in Raines, 429 So.2d at 1113. `To affirm a finding of a "particularized intent to kill", the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.'"
Lewis v. State, 456 So.2d 413, 416-17 (Ala.Cr.App. 1984).
Although the court's charge to the jury was not as clear as it could have been, the jury was given adequate and proper instructions on the element of particularized intent to kill. Moreover, defense counsel submitted no written charges on the requirement which were not either given or substantially covered by the court's charge. And counsel did not except to the court's charge on this particular ground. "Since this is not a case `in which the death penalty had been imposed,' this court is not required to `notice any plain error or defect in the proceedings under review,'" even if such existed. Id. at 417 (quoting Rule 45A, A.R.A.P.). The court's instructions did not constitute error. "The judge's failure to give a clearer or more exhaustive charge on the particularized intent to kill falls far short of rising to the level of a `particularly egregious error' that would result in a miscarriage of justice if a reversal were denied." Id. (quoting Womack v. State,435 So.2d 754, 769 (Ala.Cr.App.), aff'd, 435 So.2d 766 (Ala. 1983).
We further find that the evidence in the case at bar was clearly sufficient for the jury to reasonably conclude that appellant had the requisite intent to kill. Appellant's own statements place him at the scene of the crime and, in one statement, he claims to have shot Alley. Eyewitnesses, although not able to identify appellant, support the theory that appellant blocked Alley's view of Jones and drove the getaway car. Appellant's statements to Willingham and Frazier support the theory that, if appellant did not actually shoot Alley, he aided Jones in the shooting and helped facilitate the murder.
We are not convinced that appellant's act of standing outside the car with his hands on top of the car constituted an unconditional surrender, as argued in brief. Appellant's actions before and after the shooting are inconsistent with such a theory.
We find that the evidence is ample for the jury to have found that appellant was an active participant in the killing of Alley; that he was present, outside the car, with a view to render aid should it become necessary; and that his assistance, aid, and support continued beyond the killing when he drove the car away after Alley was shot. Appellant continued to drive at a high rate of speed while Jones fired two shots at the pursuing police car and then managed to eventually elude the police after a high speed chase. Appellant refused to open the motel room door and did nothing to facilitate a non-forcible entry into the room. Additionally, a weapon was found hidden in the motel room, which appellant did not mention when the police finally entered the room. Clearly, there was sufficient evidence from which the jury could have reasonably concluded that appellant was an accomplice to the intentional killing of Alley. We hold that the State established that appellant had the necessary culpable mental state when Alley was shot. The verdict is not contrary to the weight of the evidence, for the State proved each element with sufficient evidence to justify a verdict of guilty.
Based on the foregoing, this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] We note that appellant has an unrelated case pending before this court in which he has been sentenced to death. See Watkinsv. State, 450 So.2d 154 (Ala.Cr.App. 1983), rev'd and remanded with directions, 450 So.2d 163 (Ala. 1984), after remandment, [Ms. 6 Div. 925, March 20, 1984] (Ala.Cr.App. 1984), on return to remand, [Ms. 6 Div. 925, October 22, 1985] (Ala.Cr.App. 1985), cert. granted and remanded, [Ms. 85-441, March 28, 1986] (Ala. 1986). *Page 104