[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 840 
The appellant, Trace Royal Duncan, was charged in a two-count indictment with the capital murder of Vicki Deblieux. Count I of the indictment charged the appellant with the capital offense of murder committed during a kidnapping in the first degree, see §13A-5-40(a)(1), Ala. Code 1975. Count II of the indictment charged the appellant with the capital offense of murder committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975. The jury found the appellant guilty on both counts of the indictment and returned an advisory verdict recommending the death penalty, by a vote of 10 to 2. A separate sentencing hearing was held before the trial court, after which the appellant was sentenced to death by electrocution.
The trial court made the following findings of fact concerning the offense:
 "On the night of February 21, 1994, Vicki Deblieux, age 37, was dropped off by a friend on [interstate highway] I-59 near Chattanooga, Tennessee, to hitchhike to her mother's home in Louisiana.
 "Four teenagers, the defendant, Kenny Loggins, Dale Grayson, and Louis Mangione, all who had been drinking *Page 841 
 alcohol and smoking marijuana, saw her hitchhiking on I-59 at the Trussville exit in Jefferson County, Alabama. They offered to take her to Louisiana; despite her protests, they took her to a wooded area, on the pretense of picking up another vehicle.
 "After arriving there, one of them hit her in the head, she ran and Loggins and Grayson gave chase. They tackled her, and along with the defendant, who was wearing boots, kicked and stomped her in the head and body for 30 minutes until she died.
 "They then put her body in the back of a pickup truck and took her and her luggage to Bald Rock Mountain; after removing her clothing and playing with her body they threw her off a cliff.
 "They then went to a car wash in Pell City to wash the blood out of the truck. After rummaging through her luggage they hid the luggage in the woods.
 "On their return to Birmingham they took Mangione home and then returned to Bald Rock Mountain, where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung (one of them biting into it, according to one witness) and removing her fingers and thumbs.
 "The next morning the defendant's girlfriend found the three of them in Birmingham asleep in the truck all covered in mud and blood. After helping them clean up they all went to the defendant's apartment.
 "On February 26, 1994, three rock climbers found Ms. Deblieux's body and called the police. Her body was taken to the medical examiner's office. On examination by the medical examiner he found the following: Every bone in her face was fractured at least once, her skull was broken open with most of the brain separated from it, large laceration on back of the head, extensive bruises on the head, her left and right ribs were fractured, there [were] at least 180 stab wounds all over the body, two incised wounds in chest and abdomen, left lung removed by knife, bleeding of the tongue (from repeated hits on the head), and all fingers and thumbs removed. The cause of death was blunt force trauma to the head.
 "All defendants were later arrested after Mangione began showing one of Ms. Deblieux's fingers to friends."
The record also contains the following statement written by the appellant:
 "Dale [Grayson] had been talking about killing somebody for some time that night. I told him I didn't like it. Then he asked me if he did kill someone would I freak out. I told him, `Yea.' He said, `if I kill somebody and you freak out, I'll kill you.' So, I remember — okay. So, all I remember is Dale picking her up, taking her to Medical Center East. I got out of Dale's car, drinking some more beer and curled up on Kenny's truck. Then I heard two loud smacks, like two bottles. I looked up and saw three people running. So I went back to sleep, frightened for my life. Had only known Dale for too few days when this happened."
The appellant, after making this statement, added further information upon questioning by the authorities; he then reviewed and signed the statement. That portion of the statement is as follows:
 "Dale [Grayson] and Kenny [Loggins] stood on her throat and jumped up and down. I went over and kicked her in the head. She was put in the back of the truck and we drove somewhere where there was a lot of rocks. I noticed that someone had put a beer bottle up inside her. She did not have any clothes on at this time. Kenny and Dale *Page 842 
 took her out of the truck and threw her over the cliff. Dale, Kenny, Louis and myself left and went to a car wash. There we washed the truck. We then left and Dale and Kenny took me and Louie home. I did not see Dale and Kenny anymore until later that night. Dale and Kenny had two fingers in the back of the truck. I told Kenny he was sick, crazy. Kenny gave Louis one of the fingers. Louie showed it to me — showed me the finger later. Louis told me he was going to make a necklace and put the finger on the necklace."
 I.
The appellant contends that the evidence was insufficient to support his conviction for capital murder under § 13A-5-40(a)(1) because, he says, the State failed to prove the elements of kidnapping in the first degree. The appellant argues that there was no evidence of a kidnapping, because, he says, the victim was never restrained, held, abducted, or forcibly confined. In support of his argument, the appellant contends that the victim was willing to be a passenger in the truck and was voluntarily with the participants at the scene of the killing until the moment of her death.
Section 13A-6-43 defines "kidnapping in the first degree" as follows:
 "(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to
". . . .
 "(3) Accomplish or aid the commission of any felony or flight therefrom: or
"(4) Inflict physical injury upon him. . . ."
The abduction element of kidnapping in the first degree is defined at § 13A-6-40(2), as follows:
 "(2) ABDUCT. To restrain a person with intent to prevent his liberation by either:
 "(a) Secreting or holding him in a place where he is not likely to be found, or
 "(b) Using or threatening to use deadly physical force."
Additionally, "restrain" is defined at § 13A-6-40(1), Ala. Code 1975, as follows:
 "(1) To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is `without consent' if it is accomplished by:
"(a) Physical force, intimidation or deception. . . ."
This Court stated in Owens v. State, 531 So.2d 2, 13-14 (Ala.Cr.App. 1986):
 "Proof of intent, necessary to convict under § 13A-6-43, `must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction.' Doss v. State, 23 Ala. App. 168, 123 So. 237, 248 (1929). In the case at bar, the State's evidence was predominately circumstantial in nature. `A conviction may be had on devidence which is entirely circumstantial, so long as that evidence is so strong and cogent as to show defendant's guilt to a moral certainty.' Tanner v. State, 291 Ala. 70, 71, 277 So.2d 885, 886 (1973). `The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.' Cumbo v. State, 368 So.2d 871, *Page 843 
 874 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877
(Ala. 1979). In reviewing the sufficiency of the State's evidence of kidnapping in the first degree, we must view the evidence in the light most favorable to the State. Id."
The State's evidence revealed that the appellant and his co-defendants picked up the victim with the intent to "inflict physical injury upon" her. The appellant's written statement indicated that "Dale had been talking about killing somebody for some time that night," prior to the victim's abduction. The act of transporting the victim to an isolated area clearly supports the conclusion that the appellant and his accomplices intended to prevent her liberation by "[s]ecreting [her] or holding [her] in a place where [she was] not likely to be found. The evidence indicated that the restraint required for the abduction of the victim was accomplished through "deception." § 13A-6-40(1)(a). The evidence indicated that the victim was hitchhiking to Louisiana to see her mother and that the appellant and his codefendants, acting under false pretenses, informed the victim that they would take her to Louisiana. Additionally, evidence was presented that the victim protested when the car exited the interstate and the driver drove to a wooded area to pick up a truck. Moreover, the evidence indicated that the victim asked to be let out of the car when she realized that they were not headed toward her destination. Thus, at that point, she was being held against her will. Evidence was presented that immediately before her death, the victim was hit in the head with a beer bottle, at which time she attempted to run away but was tackled, and then kicked and beaten until she died. According to his own statement, the appellant participated in the murder. The evidence strongly suggests that the foursome intended to harm Deblieux. Moreover, there was evidence indicating that the appellant stood watch over the victim when she "used the bathroom" in the woods and that he returned to tell the others that she would be the perfect victim.
The appellant's argument that, because the victim initially entered the vehicle voluntarily, she was not forcibly confined is without merit. Merely because the victim initially agreed to accompany the individuals does not negate the fact that she was later forcibly confined. The concept of restraint is "concerned with intentional, unlawful and nonconcensual removal or confinement." § 13A-6-40, Commentary. This Court has previously held that a victim may voluntarily enter the place where she is later restrained against her will, and the crime still constitutes a kidnapping. T.R.D. v. State, 673 So.2d 838 (Ala.Cr.App. 1995); Mims v. State, 591 So.2d 120 (Ala.Cr.App. 1991); Jenkins v.State, 627 So.2d 1034 (Ala.Cr.App. 1992); and Musgrove v. State,519 So.2d 565 (Ala.CR.App. 1986).
Thus, there was sufficient evidence presented by the State to allow the jury to exclude every reasonable hypothesis except that of guilt of the capital crime charged.
 II.
The appellant contends that the evidence was insufficient to support his conviction for capital murder under § 13A-5-40(a)(2) because, he says, the State failed to prove the elements of robbery in the first degree. Specifically, the appellant argues that "there was no evidence of a robbery, and there was in fact no robbery." In support of his argument, the appellant contends that the victim had belongings with her that were in the automobile at the time of her death and that remained there until they were placed into the woods near a car wash. He further argues that there was no evidence presented *Page 844 
at trial that he took any property belonging to the victim or that robbery or theft had anything to do with the killing.
Section 13A-8-41, Ala. Code 1975, provides, in pertinent part:
 "(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
 "(1) Is armed with a deadly weapon or dangerous instrument; or
"(2) Causes serious physical injury to another."
Section 13A-8-43, Ala. Code 1975 provides:
 "(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
 "(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance. . . ."
This Court has stated:
 "To sustain a conviction under § 13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a `robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41; (2) a `murder,' as defined by § 13A-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree, § 13A-5-39(2). Connolly v. State, 500 So.2d 57 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368
(Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala. 1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
"`. . . .
 "`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [infra], O'Pry v. State, supra [642 S.W.2d 748
(Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984). *Page 845 
 See also Cobern v. State, 273 Ala. 547, 142 So.2d 869
(1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App. 1983); Bufford v. State, 382 So.2d 1162
(Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980); Clements v. State, 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723
(Ala. 1979).'
"Connolly, 500 So.2d at 63."
Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr.App. 1988).
In the present case, the jury could have reasonably inferred from the circumstances that the appellant, acting in complicity with three other individuals, planned to kill the victim and to cover up the crime by disposing of the body in such a way that it was unlikely to be found and, if found, would be difficult to identify. The jury could have reasonably inferred from the evidence that in carrying out this plan, the appellant stole the victim's luggage and personal items as a part of the overall plan or scheme to dispose of incriminating evidence. The site selected for the commission of the crime, an isolated wooded area accessible only by a dirt road, and the efforts used to dispose of the incriminating evidence are facts from which the jury could have reasonably concluded that the robbery and murder were planned in advance and that when the killing took place, the appellant intended to steal the victim's belongings. The victim's luggage and clothing were scattered in a heavily wooded area some four miles from the murder scene; the victim's other personal belongings were in the trunk of a codefendant's car. The state's evidence supported the conclusion that the robbery began when one of the appellant's accomplices began to sort through the victim's belongings while she was "using the bathroom" in the woods and was consummated after she was beaten to death and her belongings were taken. Thus, there was sufficient evidence to support the robbery component of the capital offense.
 III.
The appellant argues that the death penalty is cruel and unusual punishment and therefore that it is unconstitutional.
 "Capital punishment has repeatedly been upheld against such constitutional attacks. As we stated in Tarver v. State, 553 So.2d 631, 632 (Ala.Cr.App.), aff'd, 553 So.2d 633 (Ala. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990):
 "`The appellant argues that Alabama's capital punishment statute violates the fifth and fourteenth amendments to the United States Constitution. Specifically, he argues that this capital punishment statute constitutes cruel and unusual punishment because he says, it does not provide proper standards and safeguards to insure that the death penalty is not inflicted arbitrarily. However, this argument has also been previously addressed and rejected. Thompson v. State, 542 So.2d 1286 (Ala.Cr.App. 1988). See also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).'"
In Carden v. State, 612 So.2d 509 (Ala.Cr.App. 1992), this Court stated:
 "[The death penalty] statute has been upheld against constitutional challenges that it constitutes cruel and unusual punishment. See Tarver v. State, 553 So.2d 631 (Ala.Cr.App.), aff'd, 553 So.2d 633
(Ala.Cr.App. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990), and cases cited therein; Thompson v. State, 542 So.2d 1286 (Ala.Crim.App. 1988), aff'd, 542 So.2d 1300 (Ala.) cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 913 (1976)." *Page 846 
612 So.2d at 513. See also Harrell v. State, 470 So.2d 1303
(Ala.Cr.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied,474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Cothren v. State,705 So.2d 849, 855-56 (Ala.Crim.App. 1997).
 "The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: `Punishments are cruel when they involve torture or lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies that there is something inhuman or barbarous, — something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method of reaching the result.' Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th. Cir. 1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986).
 IV.
The appellant argues that "[t]here was no particularized intent on his part" to participate in the murder. He contends that Alabama law requires a particularized intent be proven before the death penalty can be imposed on those who play an indirect part in the murder of another person. In support of his argument, the appellant contends that "there was no evidence that [he] had any direct part to play in the killing of the victim."
 "`Section 13-9-1, Ala. Code 1975 (formerly Title 14, § 14), states:
 "'"The distinction between an accessory before the fact and a principal, between principals in the first and second degrees, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted, tried and punished as principals, as in the case of misdemeanors." (Emphasis added [in Arthur].)
 "`The accomplice statute has been applied to all felonies, both capital and non-capital in the past. It has been applied to charge an accomplice as a principal likewise in cases where specific intent to commit a crime must be charged on the part of the principal. In order to convict an accomplice of a traditional murder charge pursuant to that statute, it had been necessary to show that the accomplice had a previous understanding to kill or injure the deceased, or had a knowledge of the intent to kill on the part of the co-defendant. In Jordan v. State, 81 Ala. 20, 1 So. 577 (1886), our Supreme Court stated:
 "`". . . When a particular intent or formed design is requisite to constitute an offense, knowledge of its existence and a common purpose to perpetrate the offense must be shown before a person can be convicted of aiding and abetting.
We so held on the former appeal.
Jordan v. State, 79 Ala. 9; State v. Hidlreath, 51 Amer. Dec. 369, and notes.
"In Tanner v. State, 92 Ala. 1, 9 So. 613 (1890), the court stated: *Page 847 
 "`". . . The accomplice, as we have seen, is criminally responsible for acts which arethe direct, proximate, natural result of the conspiracy formed. He is not responsible for any special act, not within the scope of the common purpose, but grows out of the individual malice of the perpetrator. 1 Wharton Crim. Law, § 397."
 "`It is the opinion of this court that the accomplice statute brings an aider and abettor within the purview of the capital felony statute.'
"Keller v. State, 380 So.2d 926, 934-35 (Ala.Cr.App. 1979), writ denied,380 So.2d 938 (Ala. 1980).
 "In Watkins v. State, 495 So.2d 92 (Ala.Cr.App. 1986), this court held that the jury could reasonably have found that a defendant was properly convicted as an accomplice to capital murder in that he aided the triggerman in the shooting and helped facilitate the murder. Concerning the role of an accomplice in a capital offense, this court stated:
"`According to the complicity statute, § 13A-2-23, Code of Alabama 1975:
 "'"A person is legally accountable for the behavior of another constituting a criminal offense if, with intent to promote or assist the commission of the offense:
 "`"(1) He procures, induces or causes such other person to commit the offense;
 "`"(2) He aids or abets such other person in committing the offense. . . .
"`In Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App. 1984), we stated:
 "'"`Aid and abet comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary." Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raidford [Raiford] v. State, 59 Ala. 106, 108 (1877). `The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala. App. 632, 198 So.2d 625. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence.' Miller v. State, 405 So.2d 41, 46 (Ala.Cr.App. 1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App. 1977), cert. denied, 357 So.2d 161 (Ala. 1978)." (Emphasis in original.)
"`Furthermore, in Sanders v. State, 423 So.2d 348, 351 (Ala.Cr.App. 1982), it was stated:
 "`"Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala. App. 151, 326 So.2d 686 [680] (1976). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of that act, are potent circumstances from which participation may be inferred. Smith, supra."
 "`In considering accomplice liability for a capital offense, we must look *Page 848 
beyond the general principles, to the following:
 "'"`[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala., March 6, 1981)'; Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala. Law 456, 468 (1981). See also Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App. 1982), holding that Enmund is inapplicable to a defendant who does not receive the death penalty. However, a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 1111, 1112 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). . . .
"`". . . .
 "`"Our duty on appeal was stated in Raines, 429 So.2d at 1113. `To affirm a finding of a "particularized intent to kill," the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.'"
"`Lewis v. State, 456 So.2d 413, 416-17 (Ala.Cr.App. 1984)."
"495 So.2d at 102-03."
Arthur v. State, 711 So.2d 1031, 1056-58 (Ala.Cr.App. 1996).
In the present case, the trial court instructed the jury as follows:
 "The law says that in order to prove a defendant guilty of a particular crime, it is not necessarily required that the State prove that the defendant himself personally committed the act which constitutes that crime,
 "Instead, in certain circumstances, the law makes a defendant responsible for the criminal acts of another person. More specifically, the law provides that a defendant is responsible for the criminal acts of another person if, with the intent to promote or assist the commission of that offense, he aids or abets such other person in committing that offense.
 "The words `aid or abet' include all assistance rendered by acts or words of encouragement or support or presence by the defendant, either actual or constructive presence, with the intent to render assistance should it become necessary. The mere presence of a defendant who intends to assist with the criminal act, should it become necessary, is aiding and abetting if, and only if, the one who commits the act knows of the defendant's presence and the intent to assist in that offense.
 "Complicity may arise on the spur of the moment. There need not be a plan contemplated and agreed upon in advance of the offense. However, there must be a specific intent to promote, aid or assist the principal in the commission of that offense. And, of course, the defendant's mere presence without more would not be sufficient.
 "In order to convict the defendant of a capital murder under this principle, the State must not only prove beyond a reasonable doubt that he was an accomplice to the underlying offense in this case, under count one, kidnapping in the first degree, but must prove beyond a reasonable doubt that he was an accomplice in the intentional killing itself.
 "Now, ladies and gentlemen, the first count of this indictment charges the defendant with capital murder. And the law states that an intentional murder *Page 849 
 committed during kidnapping in the first degree is capital murder.
 "A person commits an intentional murder if he causes the death of another person and in performing the act or acts which cause the death of that person, he intends to kill that person.
". . . .
 "A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific.
". . . .
 "Again, a person acts intentionally with respect to a result or conduct when his purpose is to cause that result of engage in that conduct."
The trial court clearly instructed the jury that to be convicted of capital murder as an accomplice, the appellant had to possess a particularized intent to kill. Further, the trial court correctly instructed the jury with regard to accomplice liability.
Because the State presented sufficient evidence connecting the appellant with the commission of the offense and because the trial court properly charged the jury as to necessary intent, the appellant's argument is without merit.
 V.
The appellant contends that his sentence of death is disproportionate to his involvement in this offense. Specifically, he argues that there was no evidence of a robbery in this case and that, even if a robbery occurred, he "did not benefit in any way." He also contends that "he did not plan, profit, or perform any act associated with the murder."
However, the sufficiency of the evidence to support the appellant's complicity in the murder, kidnapping, and robbery has previously been discussed and decided adversely to the appellant. See parts II, III, and IV of this opinion. Two of the appellant's codefendants were sentenced to death. A third codefendant, who did not return to the scene of the crime with the others and mutilate the body after the victim had been pushed off the cliff, was sentenced to life imprisonment without parole. The appellant's sentence was not disproportionate based on his involvement in this offense.
 VI.
The appellant argues that the jury's recommendation of death was the product of bias and prejudice. He contends that the jury's recommendation was the result of hatred, bias, and prejudice because, he says, his role in the murder was "minor" in that he was "merely present" and he was not a "major actor." In support of his argument, the appellant relies on Exparte Henderson, 616 So.2d 348 (Ala. 1992), for the proposition that the imposition of the death penalty is to be ordered only in a serious and straight forward manner with safeguards at every step. Because this matter is raised for the first time on appeal, it must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
Initially, we note that the relevant factual situation in Henderson, supra, is not found in this case. In Henderson, this Court remanded that cause to the trial court to reconsider the question whether the sentence of death was excessive or disproportionate to the penalties imposed in similar cases, with specific emphasis on the case of a codefendant who was sentenced to life in prison without the possibility of parole. The trial court was further instructed to reweigh the aggravating and mitigating circumstances. In compliance with those instructions, the trial court found that the mitigating circumstances *Page 850 
which were the absence of a prior criminal record, the defendant's age, and low IQ outweighed the aggravating circumstance, and it resentenced the defendant to life imprisonment without parole.
The defendant in Henderson did not raise the issue of bias or prejudice on the part of the jury in making its recommendation. Moreover, the appellant, in his brief to this Court, offers nothing more than a bare allegation that the jury was biased or prejudiced in making its recommendation of death. The record is devoid of any evidence indicating any bias and prejudice on the part of the jury.
The record reveals that the trial court instructed the jury
as follows:
 "In reaching your findings concerning the aggravating and mitigating circumstances in this case and in determining what the punishment in this case should be, you must avoid any influence of passion, prejudice or any other arbitrary factor.
 "Your deliberations and verdict should be based upon the evidence you have seen and heard and the law on which I have instructed you. There is no room for the influence of passion, prejudice or any other arbitrary factors."
Additionally, the trial court specifically instructed the jury to consider as a statutory mitigating circumstance the fact that "the defendant was an accomplice in the capital offense committed by another person and [that] his participation was relatively minor." See §13A-5-51(5), Ala. Code 1975. ("Mitigating circumstances shall include, but not be limited to, the following: . . . . (5) The defendant acted under extreme duress or under the substantial domination of another person.") It is well settled that the weight to be given a mitigating circumstance rests with the judge and jury. Arthur v. State, supra; Exparte Hart, 612 So.2d 536 (Ala. 1992); Cochran v. State, 500 So.2d 1161,1176 (Ala.Cr.App. 1984), reversed and remanded on other grounds,500 So.2d 1179 (Ala. 1985), 500 So.2d 1188 (Ala.Cr.App.), aff'd,500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965,95 L.Ed.2d 537 (1987). There was no plain error as to this matter.
 VII.
The appellant argues that the trial court erred in admitting into evidence an oversized photograph offered by the State showing the condition of the victim's body upon its discovery. He argues that "this size photograph is excessive, that it is this size photograph that goes beyond probative and is produced for [the] sole purpose of inflaming and arousing the passion of the jury." Additionally, the appellant argues that the trial court erred when it would not allow argument outside the jury concerning the State's introduction into evidence of the oversized photograph.
It appears that the appellant is referring to an oversized photograph introduced by the State during its examination of James Patrick Moates, the individual who discovered the victim's body at Bald Rock Mountain. After Moates was shown photographs of the crime scene, including the oversized photograph, he testified that the photographs accurately depicted the scene he observed on February 26, 1994. Moreover, the photographs not only illustrated and corroborated Moates's testimony but also corroborated the testimony of Dr. Joseph Embry, the medical examiner, who performed the autopsy; thus, they were properly received into evidence.
The ultimate question in determining the admissibility of a photograph of a victim, as with all demonstrative evidence, is "whether it has a reasonable tendency to prove or disprove some material *Page 851 
fact in issue. This decision is left largely to the sound discretion of the trial judge. Of course, the decision of the trial judge is not necessarily final since his decision is reviewable to determine if there has been an abuse of discretion." C.Gamble, McElroy's Alabama Evidence
§ 207.01(2) (5th.ed. 1996) (footnotes omitted).
 "In Johnson v. State, 620 So.2d 679, 692 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), the appellant argued that grossly inflammatory photographs should not have been allowed into evidence at the guilt and penalty stages of the trial. In holding that the photographs were admissible at both stages, this court stated:
 "`We have reviewed the challenged photographs and, although they are not pleasant to look at, we conclude that the trial court did not err in admitting them at either stage of the proceedings.
 "`[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters.' Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). `[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert at 784. See also Ex parte Bankhead. We find no error in the trial court's admission of the photographs at the guilt phase of the trial. See, e.g., Smith v. State, 581 So.2d 497 (Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala. 1991) (photographs of victim's decomposed and bloated body properly admitted); Dabbs v. State, 518 So.2d 825
(Ala.Crim.App. 1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); Hamilton v. State, 492 So.2d 331 (Ala.Crim.App. 1986) (photograph of deceased's exposed scalp properly admitted into evidence)."
Boyd v. State, 715 So.2d 825, 833 (Ala.Crim.App. 1997). See also Georgev. State, 717 So.2d 827 (Ala.Crim.App. 1996); Arthur v. State,711 So.2d 1031 (Ala.Crim.App. 1996); Siler v. State, 705 So.2d 552
(Ala.Crim.App. 1997). "There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk `comes with the territory.'" Price v.State, 725 So.2d 1003, 1052, quoting Grice v. State, 527 So.2d 784, 787. (Ala.Cr.App. 1988). "Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence." Jenkins v. State,627 So.2d 1034 (Ala.Cr.App. 1992, affirmed, 627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
In Bombailey v. State, 580 So.2d 41, 46 (Ala.Cr.App. 1990), this Court, in addressing the admissibility of enlarged photographs of the victim's injuries taken at the emergency room, stated:
 "The fact that the photographs were in color and were enlarged is of no particular significance as long as there was no distortion of the depiction of the injuries. McElroy's, § 207.01(2); Harris v. Snider, 223 Ala. 94, 134 So. 807 (1931); Braswell v. State, 51 Ala. App. 698, 288 So.2d 757 (1974). The nurse and the doctor who attended the victim at the emergency room testified that, if anything, the injuries looked worse in actuality than the photographs showed. The *Page 852 
 police officer who took the photographs laid a proper predicate for the admission of these photographs, and the appellants had ample opportunity to question this officer about the photographs."
Additionally, in Lee v. State, 562 So.2d 657 (Ala.Cr.App. 1989), this Court held:
 "'"`Gruesomeness becomes objectionable in a photograph only where there is a distortion of either of two kinds; first, distortion of the subject matter as where necroptic or other surgery causes exposure of nonprobative views, e.g., "massive mutilation," McKee v. State, 33 Ala. App. 171, 31 So.2d 656 [1947]; or second, focal or prismatic distortion where the position of the camera vis-a-vis the scene or object to be shown gives an incongruous result, e.g., a magnification of a wound to eight times its true size, Wesley v. State, 32 Ala. App. 383, 26 So.2d 413
[1946].'
"`". . . .
 "`"Neither of these distortions existed in this case. The slides were just enlargements of photographs and the wounds were shown in relation to the deceased. The slides gave the jury a better understanding of the nature and gravity of the deceased's injuries, and we do not believed the slides distorted the injuries or misled the jury in any way."
"`430 So.2d at 898-99.'"
562 So.2d at 663-64.
Here, there is no indication that the oversized photograph distorted the victim's injuries or misled the jury in any way. The trial court did not abuse its discretion in admitting into evidence the oversized photograph and the other photographs; they were relevant to the issues at trial.
Because the appellant failed to object to the trial court's refusal to allow him to argue the admissibility of the photographic evidence outside the jury's presence, this issue is subject to the plain-error review. Rule 45A, Ala.R.App.P. Consequently, his failure to object weighs against any finding of prejudice. As stated earlier, the photographs in question were relevant to show the location and details of the offense and the injuries suffered by the victim; moreover, they were illustrative of a number of witnesses' testimony.
The appellant acknowledges, in his brief to this Court, that there is "no rule of law requiring that inquiries as to the admissibility of evidence be made away from the hearing of the jury; consequently, the trial court traditionally has been put in error for refusing to cause the jury to retire during discussion of admissibility only when the refusal constitutes an abuse of discretion and causes probable injury to a party." See C. Gamble, McElroy's Alabama Evidence, § 10.01(1) (5th ed. 1996). No plain error occurred when the trial court, acting within its discretion, refused to conduct a hearing outside the jury's presence on the admissibility of the evidence.
 VIII.
The appellant argues "that inadmissible hearsay was allowed into evidence," and that its admission rendered his conviction improper. More particularly, he questions a portion of the testimony elicited from State's witness, Sonya Gray, which, he argues, was the most significant evidence against him. He argues that without this hearsay, there would be "no case" against him.
The following portion of testimony is at issue here:
 "[Prosecutor]: My question was, did you have a conversation with Aimee about *Page 853 
 the story that you had heard about the dog being killed?
"[Witness]: Yes.
 "[Prosecutor]: And your answer was, `Yes.' Now, not to represent that what Aimee said to you was necessarily the truth, but for the purpose of demonstrating that Aimee said something to you about it, did she tell you anything about whether there had in fact been a dog —
 "[Defense Counsel]: Your Honor, we would pose our same objection on the same grounds.
"[Trial Court]: Overrule. You can answer.
"[Witness]: Yes.
"[Prosecutor]: What did she say?
 "[Witness]: Well, she said there wasn't a dog, it was a hitchhiker.
". . . .
 "[Prosecutor]: Did you have occasion to be at the defendant's apartment again?
"[Witness]: Yes.
"[Prosecutor]: And was Louis Mangione there?
"[Witness]: Yes.
"[Prosecutor]: Kenny Loggins there?
"[Witness]: Yes.
"[Prosecutor]: Was Dale Grayson there?
"[Witness]: No.
 "[Prosecutor]: What was the occasion for your being there, Sonya?
"[Witness]: We were visiting.
 "[[Prosecutor]: Was there someone else other than the three of them and you?
"[Witess]: Danielle.
"[Prosecutor]: Would that be Danielle Boso?
"[Witness]: Yes.
". . . .
"[Prosecutor]: What room of the apartment were y'all in?
"[Witness]: The bedroom.
 "[Prosecutor]: And did you or Danielle, in your presence, ask the defendant, Kenny Loggins and Louis Mangione about the dog, their claim that they had killed a dog?
"[Witness]: Yes.
"[Prosecutor]: What did they say?
 "[Defense counsel]: We would object, Your Honor, that would be hearsay.
"[Trial court] Overrule. She can answer.
"[Defense counsel]: Please note our exception.
"[Trial court]: All right.
"[Witness]: They asked who told us —
 "[Defense counsel]: We would object, Your Honor, unless she can say who said rather than `they.'
"[Trial court]: You need to say who, please.
 "[Witness]: Louis asked who told us and Danielle said Aimee. And Kenny said Aimee was dead. And if we were — if we said anything, we would be, too.
 "[Defense counsel]: Your Honor, we would move to strike at this time on the basis of hearsay. And that the jury be instructed to disregard that comment as being hearsay.
 "[Trial court]: My understanding the defendant was present during this conversation. Overrule.
 "[Prosecutor]: What was the next thing that was said by anybody.
"[Witness]: I don't remember.
"[Prosecutor]: Did the conversation continue?
"[Witness]: Yes.
". . . .
 "[Prosecutor]: Did Kenny or Louis or the defendant or any — Kenny or Louis, in his presence, tell you about what had happened? *Page 854 
"[Witness]: Kenny told us.
"[Prosecutor]: Did he tell you where they met?
 "[Defense counsel]: We would object, Your Honor, as to anything Louis told her as being hearsay.
"[Trial court]: I will sustain at this point.
 "[Prosecutor]: Was the defendant present when he told you that?
 "[Witness]: I don't remember if he was in the room at the time or not.
 "[Prosecutor]: As some point during this conversation did he leave the room and then come back?
 "[Witness]: He was fixing to walk in the room, but he said he didn't want to hear it and walked out. And he came back in, but I don't remember at what point he came back."
In Haney v. State, 603 So.2d 368, 399-400 (Ala.Cr.App. 1991), this Court stated:
 "The admissibility of statements by a coconspirator made outside the presence or hearing of the defendant represents an exception to the hearsay rule. `Where proof of a conspiracy exists, any act or statement by an accused's coconspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused.' Deutcsh v. State, 610 [So.2d 1212, 1222 (Ala.Cr.App. 1992)]."
Broaden v. State, 641 So.2d 1302, 1303 (Ala.Cr.App. 1994). See alsoBright v. State, 485 So.2d 398 (Ala.Cr.App. 1986); Conley v. State,354 So.2d 1172 (Ala.Cr.App. 1977).
 "`In order that the fact of a conspiracy may be established, it need not be proved by evidence of an express agreement or compact between the alleged conspirators, or by any direct evidence of any agreement or compact. It may be proved inferentially, or by circumstantial evidence. Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony, which renders it peculiarly necessary and proper to permit them to be inferred from the circumstances.' (Citations omitted.)
 "354 So.2d at 1177. `If the evidence warrants a finding of accused's participation in a conspiracy to suppress or fabricate evidence of the crime after its commission, an act or statement of a co-conspirator in the accomplishment of this continuing conspiracy is admissible against the accused.' C. Gamble, McElroy's Alabama Evidence, § 195.03(5) (3d ed. 1977). If a co-conspirator is acting in concert to suppress evidence and the statement was made in furtherance of the defendant's efforts to do so, it is admissible whether the trial is a conspiracy trial or not. Latham v. State, 56 Ala. App. 234, 320 So.2d 747, cert. denied, 294 Ala. 685, 320 So.2d 760 (1975)."
Based upon the aforementioned testimony, the State presented substantial proof of a conspiracy between the appellant and his accomplices to suppress the discovery of any evidence of the crime, as well as to suppress any evidence of their participation in the offense. The statements of coconspirators Louis Mangione and Kenny Loggins threatening the witness, Danielle Boso, and threatening Aimee White were in furtherance of this continuing conspiracy, and thus, were admissible against the appellant. Furthermore, despite the appellant's argument that without the testimony of Sonya Gray, there is "no case" against him, the record clearly reveals that the most significant evidence against the appellant is his handwritten and oral statements in which he admits his participation *Page 855 
in the beating and subsequent death of the victim. The appellant admitted, in his oral statement to police officers, that he "kicked [the victim] in the head." He stated that he was present and drinking beer when "Dale and Kenny stood on her throat" and "trampled her body," causing her to "choke on her own blood." He admitted to participating in transporting her body to Bald Rock Mountain. He was present when she was stripped of her clothes and a beer bottle was inserted into her body. The record indicates that the appellant lied to police when he told them that he went home with Louis Mangione and was not present when Loggins and Grayson returned to Bald Rock Mountain to further mutilate the victim's body. The appellant continued to be an active participant in the conspiracy by taking part in the fabrication of the "dog" story. Because the testimony of Sonya Gray revealed a continuing conspiracy, it fell within the exception to the hearsay rule as a statement by a coconspirator. C. Gamble, McElroy's Alabama Evidence, § 195.03(11) (5th ed. 1996).
Moreover, this testimony was cumulative of the appellant's admission of his participation in the offense. Therefore, any error in the admission of the statement was harmless. Rule 45A, Ala.R.App.P. Warden v. State,468 So.2d 203 (Ala.Cr.App. 1985).
 IX.
The appellant argues that the State used its peremptory strikes to exclude blacks from the jury, in violation of Batson v. Kentucky,476 U.S. 79 (1986). He argues that he established a prima facie case of racial discrimination in the prosecutor's use of its peremptory strikes and that the trial court improperly based its determination that the appellant had failed to establish a prima face case on the racial composition of the jury and the past practices of the prosecutor. At trial, the appellant objected to the State's use of its peremptory challenges, alleging that the challenges were not race-neutral. In support of his objection, however, the appellant argued that the State used 8 of its 14 strikes to remove blacks from the jury venire and that it failed to provide a race-neutral reason for five of those strikes. In light of the entire record, this did not satisfy the appellant's burden of proof.
The following colloquy transpired between defense counsel, the trial court, and the State:
 "[Defense counsel]: Judge, I would make that same motion. I believe that the State used seven strikes to strike minority group members of those —
"[Trial court]: I show eight. I may be mistaken.
"[Defense counsel]: Let me just look again.
"[Prosecutor]: Eight is correct.
"[Defense counsel]: I'm sorry, I miscounted.
"[Prosecutor]: We struck eight blacks and six whites.
 "[Trial court]: Well, for the record, according to my records, there are 17 blacks on the regular panel from which we struck after we moved those who had been struck for cause and replaced them by extra jurors. The defendant struck three blacks and the State struck eight. Go ahead, [defense counsel].
 "[Defense counsel]: Yes, sir. We would say of those — five of those strikes against minority group members were members that had no legitimate reason, people that didn't say anything at all in order to deem them to be unqualified for service. *Page 856 
 "So, we would say with him using half of his strikes to strike blacks, and of those, 5 of the 14 used to strike blacks, we would say there was no reason given for striking. We would say that he struck on the basis of race.
 "[Trial court]: I also want to point out for the record that the defendant in this case is white as well as the victim. I am going to deny your motion, [defense counsel]. In my opinion, you have failed to establish a prima facie case based on my observations during voir dire and the past record of these particular prosecutors not showing a pattern of striking on the basis of race in the past. Anything else?
"[Prosecutor]: Not from us.
"[Defense counsel]: Nothing from us."
In Boyd v. State, 715 So.2d 825, 835-36 (Ala.Cr.App. 1997), his Court, quoting George v. State, 717 So.2d 827 (Ala.Cr.App. 1996), reversed on other grounds, 717 So.2d 844 (Ala. 1996), stated:
 "[T]he appellant [in George] failed to establish a prima facie case of racial discrimination where he had simply argued that the State used 5 of its 14 peremptory strikes to remove blacks from the jury. In that case, 7 black jurors served as well as a black alternate. This Court held that the appellant's argument had been insufficient to meet his burden of proof in presenting a prima facie showing of racial discrimination.
 "`"The trial court's finding that a defendant did not present a prima facie case of discrimination under Batson is reviewed under a `"clearly erroneous' standard. Wilson v. State, 690 So.2d 449
(Ala.Cr.App. 1995). `In determining whether there is a prima facie case, the court is to consider "all relevant circumstances" which could lead to an inference of discrimination.' Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987). In Branch, the Alabama Supreme Court set forth a nonexhaustive list of nine types of evidence that could be used to raise this inference.
 "`"'1. Evidence that the "jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole." [People v.] Wheeler, 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal.Rptr. [890,] at 905 [ (1978)]. For instance "it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions," Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27,
 "`"'2. A pattern of strikes against black jurors on the particular venire;e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson [v. Kentucky], 476 U.S. [79] at 97, 106 S.Ct. [1712] at 1723 [90 L.Ed.2d 69 (1986)].
 "`"'3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.CT. 824, 13 L.Ed.2d 759 (1965)].
 "`"'4. The type and manner of the offending attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 "`"'5. The type and manner of questions directed to the challenged *Page 857 
 juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656
(1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
 "`"'6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
 "`"'7. Disparate examination of member of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
 "`"'8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229] at 242 [96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976)].
 "`"'9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See Slappy, 503 So.2d at 354, Turner, supra.'
 "`"Branch, 526 So.2d at 622-23. The fact that the prosecution engaged in a pattern of strikes against black jurors is but one factor the court may consider.
"`". . . .
 "`"When considered alone, evidence of the prosecution's use of a large number of its peremptory strikes to exclude black jurors would allow, but would not compel, a finding of prima facie discrimination. Ex parte Thomas, [659] So.2d [3] (Ala. 1994), (defendant may establish a prima facie case solely on prosecution's use of its strikes against black veniremembers). Other types of relevant evidence specified in Branch may be examined to determine whether the inference of discrimination has been raised. Even if the prosecution uses all of its peremptory strikes to exclude black jurors, a trial court is not required to rule that a prima facie case of discrimination has been made if other relevant evidence sheds light upon the issue."
 "`Mines v. State, 671 So.2d 121, 123 (Ala.Cr.App. 1995) (emphasis in original).
 "`The party alleging a Batson violation has the burden of establishing a prima facie case of discrimination. The appellant did not meet that burden. The only evidence presented that a Batson violation occurred was that the State used 5 of its 14 strikes to remove blacks. The trial court's ruling that no prima facie case had been established was not clearly erroneous.'"
"George v. State, 717 So.2d 835-37."
A trial court's determination concerning the establishment of a prima facie case of racial discrimination is to be accorded great deference on appeal, Folsom v. State, 668 So.2d 114 (Ala.Cr.App. 1995, and in this case the trial court's determination was not clearly erroneous.
 X.
The appellant argues that the trial court abused its discretion when it *Page 858 
allowed the same questions to be asked on multiple occasions. He argues that the State was allowed to ask its witness, Sonya Gray, repeatedly during direct examination, questions regarding a conversation that she had with the appellant and his codefendants concerning the murder. In support of his argument, he argues that even though a specific objection was not made, in addition to the raised objection as to "asked and answered," the questions also assumed a fact not in evidence; specifically, that the appellant was in the room with the co-defendants when the conversation took place.
The appellant, in his brief to this Court, has offered nothing more than a bare allegation that the trial court abused its discretion and that he was prejudiced thereby. However, the record contains no indication of an abuse of discretion in this regard. "In the absence of a showing to the contrary, it is presumed that court proceedings are regular and proper, that the trial court has properly discharged its duties, and that it has observed all the necessary formalities imposed on it by law." Barrett v. State, 705 So.2d 529, 533 (Ala.Cr.App. 1996). "The mode of conducting the examination of witnesses and the order of introducing evidence are matters within the discretion of the trial court, and the exercise of this discretion is not revisable by the appellate court." Drs. Lane, Bryant, Eubanks Dulaney v. Otts,412 So.2d 254, 259 (Ala. 1982); See also Penry v. Dozier, 49 So. 909
(Ala. 1909) (the trial court has discretion to determine how often counsel may repeat a question the witness has answered). There was no improper repetitiveness in questioning by the prosecutor concerning this conversation; the record established that Sonya Gray's testimony established the appellant's presence during this conversation.
 XI.
The appellant argues that, during his closing argument, the prosecutor improperly commented on the appellant's failure to testify. He further argues that the trial court erred in failing to give a proper curative instruction.
The portion of the prosecutor's closing argument to which the appellant takes issue is as follows:
 "[Prosecutor]: Again we don't have a witness to come in here and testify what happened, but you can infer from the evidence that you got that they killed her, they took the body out to Bald Rock Mountain, and went through her stuff.
 "[Defense counsel]: Your Honor, we would object at this time. May we approach the bench for a moment?
"[Trial court]: State your objection.
 "[Defense counsel]: Your Honor, I believe he made a reference to the fact that we don't have a witness to testify at that time, and that is an improper comment on [the appellant's] decision not to testify. We ask the jury be cautioned that that is an improper comment and that no comment can be made upon anybody who is a witness there to that, as far as [the appellant] goes, to be required to so state.
 "[Trial court]: Well, ladies and gentlemen, I didn't hear all of the comment, but as far as the defendant in a criminal case has a constitutional right not to testify. And if he chooses not to, no inference can be made by you as to his guilt or innocence, and it would be improper to make such a comment. Just keep that in mind, if you would.
 "[Defense counsel]: Your Honor, could the jury be also instructed to disregard that comment in its entirety? *Page 859 
 "[Trial court]: Well, I will decline to do that at this point.
"[Defense counsel]: Please note my exception, Your Honor.
 "[Trial court]: I didn't take it as a reference — . . . to the defendant.
"[Defense counsel]: Thank you, Your Honor."
"`A reviewing court must evaluate allegedly improper comments made by the prosecutor in the context of the entire proceeding in which the comments were made.'" Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, 503 U.S. 974,112 S.Ct. 1594, 118 L.Ed.2d 310 (1992) (quoting Donnelly v.DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
 "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App. 1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100 (Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016
(Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App. 1982)."
Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), aff'd in relevant part, remanded on other grounds, 585 So.2d 112, 127 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992).
 "`"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988), (citations omitted). Wide discretion is allowed the trial court is regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). "In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, . . . each case must be judged on its own merits," Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed. 1005 (1989) (citation omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974)). . . . "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." Mitchell v. State, 480 So.2d 1254, 1257-58
(Ala.Cr.App. 1985) (citations omitted). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App. 1985) (citations omitted).'
"Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App. 1992)."
Lockhart v. State, 715 So.2d 895, 902-03 (Ala.Cr.App. 1997). See alsoMiles v. State, 715 So.2d 913, 917 (Ala.Cr.App. 1997) ("It is possible for the prosecutor to ask the jury to draw inferences from the lack of evidence as well as from the evidence presented.")
This Court in Baxter v. State, 723 So.2d 810, 815-16 (Ala.Cr.App. 1998), stated: *Page 860 
 "Although direct comments on a defendant's failure to testify can amount to reversible error, whether they do must be determined on a case-by-case basis, and, under certain circumstances, the comment may be curable or may be harmless. In deciding whether such an improper remark constitutes harmless error, courts have looked at certain factors. The Tennessee Supreme Court listed the following five factors to consider in making this determination:
 "`1. The conduct complained of viewed in the context of the light of the facts and circumstances of the case.
 "`2. The curative measures taken by the court and the prosecution.
 "`3. The intent of the prosecutor making the improper statement.
 "`4. The cumulative effect of the improper conduct and any other errors in the record.
 "`5. The relative strength or weakness of the case.
 "`Judge [v. State], 539 S.W.2d [340], 344 [(Tenn.Crim.App. 1976), approved in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).] The court should also consider whether the remarks were lengthy and repeated or whether they were single and isolated. Id. Moreover, courts must remain cognizant of the fact that remarks require reversal only when the remarks "so infected the trial with unfairness as to make the subsequent conviction a denial of due process." In addition to these factors consideration should be given to the principal that a prompt instruction by the trial judge generally cures any error, since the jury is presumed to have followed the trial judge's instructions.'
 "State v. Taylor, (Ms. 02C01-9501-CR-00029, October 10, 1996) (Tenn.Crim.App. 1996) (some citations omitted (unpublished opinion)."
When viewed in the context of the entire argument, the comment reflects upon the State's lack of witnesses available to offer direct evidence of the murder. The record indicates that subsequent to the comment at issue, the prosecutor asked the jury to consider the amount of circumstantial evidence against the appellant. Accord, Ex parte Davis,718 So.2d 1166 (Ala. 1998).
The prosecutor's comment does not warrant a reversal of the appellant's conviction.
 XII.
This Court is required by § 13A-5-53, Ala. Code 1975, to review the propriety of the appellant's sentence of death and to examine the record in this case for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the trial court's findings concerning the aggravating and mitigating circumstances in this case. The trial court found the following aggravating circumstances: that the capital offenses occurred while the appellant was engaged, or was an accomplice, in the commission of, or an attempt to commit, robbery and kidnapping and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. As for mitigating circumstances, the trial court considered the fact that the appellant did not have a significant history of prior criminal activity and that he was 17 years old at the time of the crime. Our review of the record indicates that the trial court's findings are supported by the record. We find no evidence that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances convinces us that *Page 861 
death is the appropriate and proper sentence in this case.
Furthermore, the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant.
Pursuant to Rule 45A, Ala.R.App.P., we have thoroughly reviewed the record in this case, and we find no error that adversely affected this appellant's rights during the guilt phase or the sentencing phase of this trial. The appellant's convictions for these capital offenses and his sentence of death are proper. The judgment of the trial court is affirmed.
AFFIRMED.
Long, P.J., and Cobb, Baschab, and Fry, JJ., concur.
THE STATE OF ALABAMA — JUDICIAL DEPARTMENT